<pre>
 1                    UNITED STATES DISTRICT COURT

 2                 FOR THE WESTERN DISTRICT OF TEXAS

 3                      U.S. MAGISTRATE JUDGE

 4                        EL PASO DIVISION

 5   UNITED STATES OF AMERICA )No. EP:19-MJ-09846-ATB

 6   vs.                     )El Paso, Texas

 7   TRAVIS WAYNE VAVRA      )
                             )December 16, 2019
 8   _____

 9

10                  PRELIMINARY/DETENTION HEARING

11                 Before the Honorable Anne T. Berton

12

13   A P P E A R A N C E S:
     ----------------------
14   FOR THE GOVERNMENT:

15   MS. SARAH VALENZUELA
     MR. IAN HANNA
16   --------------------------------
     Assistant United States Attorney
17   700 E. San Antonio, Suite 200
     El Paso, Texas 79901
18

19
     FOR DEFENDANT:
20
     MR. SHANE McMAHON
21   ---------------------------------------
     700 E. San Antonio Avenue, Suite D-401
22   El Paso, Texas 79901

23

24       Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.
</pre>

 1          THE COURT:  The Court calls the case of the

 2  United States of America versus Travis Wayne Vavra in

 3  EP:19-9846 for preliminary and detention hearings.

 4      May I have announcements, please.

 5          MS. VALENZUELA:  Good morning, Your Honor.

 6  Sarah Valenzuela and Ian Hanna for the United States.

 7          THE COURT:  Thank you.

 8          MR. McMAHON:  Good morning, Your Honor.  Shane McMahon

 9  for the Defendant, ready to proceed.

10          THE COURT:  Thank you.  Will the Government call your

11  first witness?

12          MS. VALENZUELA:  The United States calls

13  Richard Tillman.

14          THE COURT:  Do you swear to tell the truth, the whole

15  truth, and nothing but the truth so help you God?

16          AGENT TILLMAN:  I do.

17          THE COURT:  Agent, please have a seat and get the

18  microphone close to you.

19      Go ahead, Ms. Valenzuela.

20          MS. VALENZUELA:  Good morning.  Can you please state

21  your full name for the record?

22          AGENT TILLMAN:  Richard Tillman.

23          MS. VALENZUELA:  Agent Tillman, where do you work?

24          AGENT TILLMAN:  With the FBI.

25          MS. VALENZUELA:  How long have you worked as an FBI

1   agent?

2           AGENT TILLMAN:  Nine years.

3           MS. VALENZUELA:  What kind of cases do you

4   investigate?

5           AGENT TILLMAN:  Crimes against children.

6           MS. VALENZUELA:  Did you participate in the

7   investigation and the arrest of the Defendant in this case,

8   Travis Vavra?

9           AGENT TILLMAN:  Yes.

10           MS. VALENZUELA:  What was the Defendant arrested for?

11           AGENT TILLMAN:  For trafficking an [inaudible] minor.

12           MS. VALENZUELA:  Do you see the Defendant in the

13   courtroom today?

14           AGENT TILLMAN:  I do.

15           MS. VALENZUELA:  Can you please describe where he is

16   seated and an article of clothing he is wearing?

17           AGENT TILLMAN:  Seated at the Defense table wearing a

18   dark blue jumpsuit.

19           MS. VALENZUELA:  Your Honor, may the record reflect

20   the witness identified the Defendant in this case,

21   Travis Vavra?

22           THE COURT:  It will.

23           MS. VALENZUELA:  How did the investigation into the

24   Defendant begin?

25           AGENT TILLMAN:  The victim made an outcry of sexual

1    abuse which was brought to the attention of the FBI.

2         MS. VALENZUELA:  When you say the victim made an

3    outcry, it was a minor?

4         AGENT TILLMAN:  Yes, it was.

5         MS. VALENZUELA:  Did you draft the criminal complaint

6    in this case?

7         AGENT TILLMAN:  Yes, I did.

8         MS. VALENZUELA:  Is that minor child who made the

9    outcry identified in the complaint as victim?

10        AGENT TILLMAN:  Yes, he is.

11        MS. VALENZUELA:  Was the victim interviewed?

12        AGENT TILLMAN:  Yes.

13        MS. VALENZUELA:  Do you remember around when the

14    victim was interviewed?

15        AGENT TILLMAN:  December 2nd, 2019.

16        MS. VALENZUELA:  Who did the victim identify as the

17    person who sexually assaulted him?

18        AGENT TILLMAN:  Travis Vavra.

19        MS. VALENZUELA:  Is that the Defendant in this case?

20        AGENT TILLMAN:  Yes.

21        MS. VALENZUELA:  Approximately when did the victim say

22    he met the Defendant?

23        AGENT TILLMAN:  The summer of 2015 between the months

24    of May and July.

25        MS. VALENZUELA:  How old would the victim have been at

1    that time?

2              AGENT TILLMAN:  Nine years old.

3              MS. VALENZUELA:  To go back.  When the victim was

4    interviewed -- how old is the victim right now?

5              AGENT TILLMAN:  13 years old.

6              MS. VALENZUELA:  How did the victim say he met the

7    Defendant?

8              AGENT TILLMAN:  The Defendant posted a flyer

9    soliciting children to actually soliciting season passes to

10   Wet & Wild Water Park so the victim's family member inquired

11   about the passes and contacted Vavra.  In order to get the

12   passes, he had to meet with Vavra in which the victim also met

13   Vavra.

14             MS. VALENZUELA:  When you say there was an individual,

15   this individual, is that person referred to in the complaint as

16   person No. 1?

17             AGENT TILLMAN:  Yes.

18             MS. VALENZUELA:  This was a relative of the minor

19   victim?

20             AGENT TILLMAN:  Yes.

21             THE COURT:  Agent, you can move that microphone

22   towards you.  There you go.

23        Go ahead, Ms. Valenzuela.

24             MS. VALENZUELA:  What happened after the victim and

25   person No. 1 went to meet the Defendant about these free

1    passes?  What happened during the meeting?

2              AGENT TILLMAN:  Vavra gave person No. 1 a business

3    card stating that Vavra was a truck driver and drove children

4    around the country to ultimately show the children the

5    United States to [inaudible] around the United States and

6    offered to take the victim.

7              MS. VALENZUELA:  Did person No. 1 and victim

8    eventually follow-up on this offer and go with the Defendant?

9    Did the victim go with the Defendant?

10             AGENT TILLMAN:  Yes.  The victim did.

11             MS. VALENZUELA:  Approximately when did Vavra take the

12   victim on the first trip?

13             AGENT TILLMAN:  This was July 2015.

14             MS. VALENZUELA:  Going back to the Defendant, what did

15   he say his line of work was?  Why would he be able to take

16   children across the country?

17             AGENT TILLMAN:  Because he was a truck driver.

18             MS. VALENZUELA:  Did he take the victim in his truck?

19             AGENT TILLMAN:  Yes.

20             MS. VALENZUELA:  What kind of truck was it?

21             AGENT TILLMAN:  It was a Peter-Bilt Model 579

22   18 wheeler semi-truck.

23             MS. VALENZUELA:  You said the first trip he took the

24   victim on was July 2015?

25             AGENT TILLMAN:  Yes.

1           MS. VALENZUELA:  How old was the victim at this time?

2           AGENT TILLMAN:  Nine years old.

3           MS. VALENZUELA:  What was the starting point for this

4    trip?

5           AGENT TILLMAN:  Anthony, Texas.

6           MS. VALENZUELA:  Is that in the Western District of

7    Texas?

8           AGENT TILLMAN:  Yes.

9           MS. VALENZUELA:  What was the final destination for

10   this trip?

11          AGENT TILLMAN:  Chicago, Illinois.

12          MS. VALENZUELA:  Where did the victim sleep during

13   this trip?  What were the sleeping arrangements?

14          AGENT TILLMAN:  There was a -- they call it a sleeping

15   bed in the truck which at that time had only one bed, and the

16   victim slept in that bed.

17          MS. VALENZUELA:  Where did the Defendant sleep during

18   this trip?

19          AGENT TILLMAN:  Also in the bed.

20          MS. VALENZUELA:  Did they make any stops during this

21   first trip?

22          AGENT TILLMAN:  They did.

23          MS. VALENZUELA:  Where was the stop they made?

24          AGENT TILLMAN:  Belvedere, Illinois.

25          MS. VALENZUELA:  Did anything significant happen

1    during this stop?

2          AGENT TILLMAN:  At that stop, they stopped at a truck

3    stop in which the victim and Vavra took a shower together at

4    the truck stop.

5          MS. VALENZUELA:  After this trip, did the Defendant

6    give the victim anything?

7          AGENT TILLMAN:  Yes. $100 and a cell phone.

8          MS. VALENZUELA:  Did the victim say he took any other

9    trips with the Defendant?

10         AGENT TILLMAN:  Yes, several.

11         MS. VALENZUELA:  Approximately when was the second

12    trip the victim went on with the Defendant?

13         AGENT TILLMAN:  Can I look?

14         THE COURT:  Yes, go ahead.

15         AGENT TILLMAN:  The second trip was in September 2015.

16         MS. VALENZUELA:  Agent, now that you have your notes,

17    I want to go back and make sure I have the first trip right.

18    The first stop that they made on the first trip in July 2015,

19    you said it was in Belvedere, Illinois?

20         AGENT TILLMAN:  No, was mistaken.  It was in

21    Joplin, Missouri.

22         MS. VALENZUELA:  Approximately when was the second

23    trip?

24         AGENT TILLMAN:  September 2015.

25         MS. VALENZUELA:  How old would the victim have been at

1   that time?

2           AGENT TILLMAN:  Ten years old.

3           MS. VALENZUELA:  Were the sleeping arrangements the

4   same this trip as the previous trip?

5           AGENT TILLMAN:  Yes, they were.

6           MS. VALENZUELA:  The Defendant and the victim slept

7   together in the same bed?

8           AGENT TILLMAN:  Correct.

9           MS. VALENZUELA:  What was the starting point for this

10  trip?

11          AGENT TILLMAN:  Anthony, Texas.

12          MS. VALENZUELA:  Again, in the Western District of

13  Texas?

14          AGENT TILLMAN:  Yes.

15          MS. VALENZUELA:  What was the destination for the

16  second trip?

17          AGENT TILLMAN:  The final destination was [inaudible].

18          MS. VALENZUELA:  Did the Defendant and the victim make

19  any stops in the second trip in September 2015?

20          AGENT TILLMAN:  Yes.  They stopped in [inaudible]

21  Arizona.

22          MS. VALENZUELA:  Did anything significant happen

23  during that stop?

24          AGENT TILLMAN:  Yes.  It was where the first sexual

25  assault.

1          MS. VALENZUELA:  What specifically happened?

2          AGENT TILLMAN:  Vavra performed oral sex on the

3    victim.

4          MS. VALENZUELA:  Does that activity violate any

5    Arizona law?

6          AGENT TILLMAN:  Yes, it does.

7          MS. VALENZUELA:  Did the victim and the Defendant stop

8    anywhere else during the second trip?

9          AGENT TILLMAN:  In California.

10         MS. VALENZUELA:  Did any sexual activity occur between

11   the victim and the Defendant in that stop in California?

12         AGENT TILLMAN:  Yes.  Vavra performed oral sex on the

13   victim at that time as well.

14         MS. VALENZUELA:  Is that in violation of any

15   California law?

16         AGENT TILLMAN:  Yes.

17         MS. VALENZUELA:  Did the Defendant also take the

18   victim on a trip in October 2015?

19         AGENT TILLMAN:  Yes, he did.

20         MS. VALENZUELA:  What was the starting point for that

21   trip?

22         AGENT TILLMAN:  Anthony, Texas.

23         MS. VALENZUELA:  Again, in the Western District of

24   Texas?

25         AGENT TILLMAN:  Yes.

1          MS. VALENZUELA:  What was the destination for that

2   trip?

3          AGENT TILLMAN:  Wisconsin.

4          MS. VALENZUELA:  Did the Defendant and the victim make

5   any stops during that trip?

6          AGENT TILLMAN:  Yes.  They stopped in

7   Belvedere, Illinois.

8          MS. VALENZUELA:  Did any sexual assault occur during

9   that stop?

10          AGENT TILLMAN:  Yes.  The victim reported that Vavra

11   forced the victim to perform oral sex on Vavra.

12          MS. VALENZUELA:  Is that in violation of any Illinois

13   law?

14          AGENT TILLMAN:  Yes, it is.

15          MS. VALENZUELA:  Did the Defendant take the victim on

16   any other interstate trips?

17          AGENT TILLMAN:  Yes; several others.

18          MS. VALENZUELA:  On that trip in October 2015, it was

19   also in the Defendant's truck?

20          AGENT TILLMAN:  Yes.

21          MS. VALENZUELA:  Going back to the outcry.  That

22   outcry happened in this year.  Is that correct?

23          AGENT TILLMAN:  Correct.

24          MS. VALENZUELA:  From the time the victim met the

25   Defendant in 2015 up until this year, the Defendant took the

1    victim on several interstate trips in his tractor trailer?

2          AGENT TILLMAN:   That's correct.

3          MS. VALENZUELA:   And did sexual activity occur during

4    each and every one of the trips?

5          AGENT TILLMAN:   Correct.

6          MS. VALENZUELA:   What type of sexual activity occurred

7    during these trips?

8          AGENT TILLMAN:   Vavra performed oral sex on the

9    victim.

10          MS. VALENZUELA:   After these initial trips in 2015,

11    did the Defendant and the victim form a relationship then?

12          AGENT TILLMAN:   They did.

13          MS. VALENZUELA:   How was that relationship described?

14          AGENT TILLMAN:   The victim describes Vavra as being

15    like a grandfather, and Vavra also described the victim as

16    being like a grandchild to him.

17          MS. VALENZUELA:   Did the Defendant give the victim

18    anything during this five year period?

19          AGENT TILLMAN:   Yes.   He gave the victim video game

20    systems, cell phones, money, clothing, paid some of the

21    victim's bills, household bills.

22          MS. VALENZUELA:   Did he also give him a credit card to

23    use?

24          AGENT TILLMAN:   Yes.   Credit card and a debit card

25    both which were in Vavra's name.

1          MS. VALENZUELA:  How did the victim and the Defendant
2     regularly communicate?

3          AGENT TILLMAN:  Via cell phone, text message, voice,
4     and Facebook Messenger.

5          MS. VALENZUELA:  Did the Defendant ever talk sexually
6     to the victim?

7          AGENT TILLMAN:  Not during those means of
8     communication.

9          MS. VALENZUELA:  Did the victim say whether the
10    Defendant talked sexually to him over the phone like talking in
11    conversation?

12         AGENT TILLMAN:  No.

13         MS. VALENZUELA:  Did the victim ever refuse the
14    Defendant's advances?

15         AGENT TILLMAN:  Yes, he did.

16         MS. VALENZUELA:  How would he refuse the sexual
17    advances?

18         AGENT TILLMAN:  He would tell Vavra that he didn't
19    want Vavra to perform oral sex on him, and at that time Vavra
20    would cop an attitude and roll over in the bed [inaudible] at
21    night.

22         MS. VALENZUELA:  Did the Defendant ever threaten the
23    victim in any way?

24         AGENT TILLMAN:  Yes, he did.  Vavra threatened the
25    victim by saying that the victim would go to a juvenile

1  detention facility; juve.

2  MS. VALENZUELA:  Why would the victim go to juve?

3  AGENT TILLMAN:  If the victim reported that Vavra

4  sexually assaulted him.

5  MS. VALENZUELA:  Did you interview the individual

6  referred to in the criminal complaint as Person No. 1, the

7  relative?

8  AGENT TILLMAN:  Yes.

9  MS. VALENZUELA:  What did Person No. 1 say about how

10  they met the Defendant?

11  AGENT TILLMAN:  They said that they saw [inaudible]

12  soliciting for Wet & Wild Water Park and season passes at a gas

13  station in a grocery store in which they called the number

14  which was to Vavra.

15  MS. VALENZUELA:  Was that confirming what the victim

16  said about how they met the Defendant?

17  AGENT TILLMAN:  Yes.

18  MS. VALENZUELA:  Did Person No. 1 say whether the

19  Defendant and victim went on any interstate trips?

20  AGENT TILLMAN:  Yes.  They went on one interstate trip

21  together.

22  MS. VALENZUELA:  What did Person No. 1 say about the

23  trips that the victim took with the Defendant?

24  AGENT TILLMAN:  Sorry?

25  MS. VALENZUELA:  Did Person No. 1 confirm whether the

1   Defendant and the victim went on any interstate trips alone?

2          AGENT TILLMAN:  Yes.  The person stated that the

3   victim went on several trips with Vavra.

4          MS. VALENZUELA:  Did Person No. 1 say whether the

5   victim eventually told them about the sexual abuse?

6          AGENT TILLMAN:  Yes.  The first -- Person No. 1 was

7   told of the sexual abuse of the victim.

8          MS. VALENZUELA:  I want to turn your attention to the

9   arrest of the Defendant.  When was the Defendant arrested?

10          AGENT TILLMAN:  Friday, December 6th, 2019.

11          MS. VALENZUELA:  Where did you arrest the Defendant?

12          AGENT TILLMAN:  At the Sunland Park Shopping Center.

13          MS. VALENZUELA:  Why did you arrest the Defendant at

14   that time?

15          AGENT TILLMAN:  Because [inaudible] the surveillance

16   and saw Vavra enter to the mall, and we decided to effect the

17   arrest then because we thought he may be scouting for other

18   victims.

19          MS. VALENZUELA:  Did you interview the Defendant after

20   arresting him?

21          AGENT TILLMAN:  Yes.

22          MS. VALENZUELA:  Did you Mirandize him prior to

23   interviewing him?

24          AGENT TILLMAN:  Yes.

25          MS. VALENZUELA:  Did he make a statement?

```
 1              AGENT TILLMAN:  Yes, he did.

 2              MS. VALENZUELA:  What did the Defendant say about his

 3   occupation or his business?

 4              AGENT TILLMAN:  He said he was a truck driver for

 5   TAX, Incorporated.

 6              MS. VALENZUELA:  How long had he been doing that?

 7              AGENT TILLMAN:  He said he had been a truck driver for

 8   40 plus years.

 9              MS. VALENZUELA:  Did the Defendant admit he knew the

10   victim?

11              AGENT TILLMAN:  Yes, he did.

12              MS. VALENZUELA:  What did the Defendant say he called

13   the victim?

14              AGENT TILLMAN:  He called the victim Bubba.  It was

15   the nickname.

16              MS. VALENZUELA:  Who brought up the victim during the

17   interview?  Did the agents or did he?

18              AGENT TILLMAN:  No; Vavra.

19              MS. VALENZUELA:  He brought up the victim on his own?

20              AGENT TILLMAN:  Correct.

21              MS. VALENZUELA:  How did the Defendant say he met the

22   victim?

23              AGENT TILLMAN:  After posting flyers for Wet & Wild

24   Water Park season passes, the victim's family member contacted

25   Vavra in which he communicated with Person No. 1, the family
```

1   member, to give them the water park passes and eventually

2   [inaudible] the victim.

3          MS. VALENZUELA:  Approximately when did the Defendant

4   say he met the victim?

5          AGENT TILLMAN:  2015 between maybe in July.

6          MS. VALENZUELA:  Did the Defendant admit that the

7   victim was a minor at that time?

8          AGENT TILLMAN:  Yes, he did.

9          MS. VALENZUELA:  Did the Defendant ever mention taking

10  trips with the victim during the interview?

11         AGENT TILLMAN:  Yes, he did.

12         MS. VALENZUELA:  What did he say about the trips?

13         AGENT TILLMAN:  He said he would take the victim with

14  him while he was working dropping loads of food off at

15  different locations across the United States.

16         MS. VALENZUELA:  He admitted to transporting the

17  victim to different states?

18         AGENT TILLMAN:  Yes.

19         MS. VALENZUELA:  Did he say where he transported the

20  victim or specifically which states?

21         AGENT TILLMAN:  I don't recall if he stated

22  specifically which states he took him to.

23         MS. VALENZUELA:  Did he admit to engaging in sexual

24  activity with the victim?

25         AGENT TILLMAN:  No.  He denied it.

1          MS. VALENZUELA:  He denied that?

2          AGENT TILLMAN:  Correct.

3          MS. VALENZUELA:  Did he ever admit to touching the

4    victim inappropriately?

5          AGENT TILLMAN:  Yes, he did.

6          MS. VALENZUELA:  What did he say about that?

7          AGENT TILLMAN:  He said he possibly touched the

8    victim's anus and penis while they were wrestling while in

9    Vavra's house, hotel, and in the truck.

10          MS. VALENZUELA:  Where would the wrestling occur

11    specifically, on a bed?

12          AGENT TILLMAN:  On a bed, or in his house, or in a

13    hotel room, or in the bed in the truck like the specific bed of

14    the truck.

15          MS. VALENZUELA:  Did the Defendant admit to sleeping

16    in the same bed as the victim?

17          AGENT TILLMAN:  Yes, he did.

18          MS. VALENZUELA:  Did the Defendant mention the victim

19    accusing him of sexual assault?

20          AGENT TILLMAN:  Yes, he did.

21          MS. VALENZUELA:  Again, did he bring that up or did

22    you all bring that up?

23          AGENT TILLMAN:  Vavra initiated that final

24    conversation.

25          MS. VALENZUELA:  Going back to the trips.  What did

1  the Defendant say was the purpose of transporting the victim on

2  these different trips?

3          AGENT TILLMAN:  To show him the world and show him

4  different sites that he had never seen.

5          MS. VALENZUELA:  Did he ever mention being lonely on

6  these trips?

7          AGENT TILLMAN:  Yes.  He said taking children was a

8  good form of companionship because he got lonely.

9          MS. VALENZUELA:  Did he admit with providing the

10  victim cell phones during this five year period?

11          AGENT TILLMAN:  Yes, he did.

12          MS. VALENZUELA:  Did he admit to providing the victim

13  with gaming systems?

14          AGENT TILLMAN:  Yes.

15          MS. VALENZUELA:  Did he admit to providing the victim

16  with money?

17          AGENT TILLMAN:  Yes.

18          MS. VALENZUELA:  With clothes?

19          AGENT TILLMAN:  Yes.

20          MS. VALENZUELA:  In the Defendant's own words, what

21  did he say about all of the things he would buy the victim?

22          AGENT TILLMAN:  He said, "It wasn't as if I was trying

23  to bribe him with the gifts."

24          MS. VALENZUELA:  On his own, the Defendant mentioned

25  that he was not buying him all of this stuff to bribe him?

```
1              AGENT TILLMAN:  Correct.

2              MS. VALENZUELA:  Going back to the Defendant's arrest.

3    Prior to the arrest, you mentioned that there was surveillance

4    being conducted on the Defendant?

5              AGENT TILLMAN:  Correct.

6              MS. VALENZUELA:  Where was the Defendant staying at

7    this time?

8              AGENT TILLMAN:  At the La Quinta Inn off of Mesa and

9    I-10 by the Cracker Barrel Restaurant.

10             MS. VALENZUELA:  Did the agents conducting the

11   surveillance see him do anything significant while surveilling?

12             AGENT TILLMAN:  Yes.  They observed him go to the

13   Walmart which is there in that area and then afterwards to

14   earlier that day to several businesses.

15             MS. VALENZUELA:  Did they see him post anything on any

16   of these?

17             AGENT TILLMAN:  Yes.  At the businesses, they saw him

18   go to the storefront of the business and post something.

19             MS. VALENZUELA:  During the course of the

20   investigation, did you ever become aware of a flyer that

21   started circulating on social media channels that might be

22   possibly linked to the Defendant?

23             AGENT TILLMAN:  Yes.  That very next day.

24             MS. VALENZUELA:  Your Honor, may I approach as an

25   exhibit?
```

 1            THE COURT:  Have you shown it to Mr. McMahon yet?

 2            MS. VALENZUELA:  Yes.

 3            MR. McMAHON:  She has, Your Honor.

 4            THE COURT:  Go ahead, Ms. Valenzuela.

 5            MS. VALENZUELA:  Agent Tillman, is that the flyer that

 6    was circulating on social media that might be connected with

 7    the Defendant?

 8            AGENT TILLMAN:  Yes, it is.

 9            MS. VALENZUELA:  I marked it as Government's Exhibit 1

10    for the purposes of this hearing.  Can you please read the

11    contents of the flyer out loud.

12            MR. McMAHON:  Your Honor, until it is in evidence, I

13    ask it not be read.

14            THE COURT:  Are you going to admit it into evidence?

15            MS. VALENZUELA:  Yes, Your Honor.  The Government

16    moves to admit Exhibit 1 into evidence.

17            MR. McMAHON:  No objection.

18            THE COURT:  It is admitted as Government's Exhibit 1.

19            MS. VALENZUELA:  Go ahead.

20            AGENT TILLMAN:  "[inaudible] if your kids want

21    something to do at school breaks, I am a truck driver.  If your

22    kids want to see different places, I am willing to let them go

23    with me.  My trucks have GPS tracking so you know where we are

24    at all times.  I pay them $100 a week.  It teaches them

25    responsibility.  Kids are well guarded.  This keeps me from

1    being so bored.  If interested, call."  And there are strips at

2    the bottom with the phone number of (915)999-1962.

3              MS. VALENZUELA:  Is that the Defendant's phone number?

4              AGENT TILLMAN:  If I read it correctly, yes, it is.

5              MS. VALENZUELA:  Then did you ever execute a warrant

6    on the Defendant's hotel room?

7              AGENT TILLMAN:  Yes.

8              MS. VALENZUELA:  Your Honor, may I approach with

9    another exhibit?

10             THE COURT:  Okay.  It was shown as well,

11   Ms. Valenzuela?

12             MS. VALENZUELA:  Yes, Your Honor.

13             THE COURT:  Go ahead.

14             MS. VALENZUELA:  I just handed you what was marked as

15   Government's Exhibits 2 and 3.  Do you recognize those?

16             AGENT TILLMAN:  Yes, I do.

17             MS. VALENZUELA:  What are those?

18             AGENT TILLMAN:  Exhibit 2 is a packet of laminating

19   paper, and Exhibit 3 is a neon yellow pad of paper.

20             MS. VALENZUELA:  Those two documents I handed you are

21   photographs of those things?

22             AGENT TILLMAN:  Yes.

23             MS. VALENZUELA:  Were those things recovered from the

24   Defendant's motel room?

25             AGENT TILLMAN:  Yes, they were.

1          MS. VALENZUELA:  At this time, I move to admit

2    Government's Exhibits 2 and 3.

3          THE COURT:  Any objections, Mr. McMahon?

4          MR. McMAHON:  No objection, Your Honor.

5          THE COURT:  Ms. Valenzuela, before I admit it, this

6    one needs a sticker.

7          MS. VALENZUELA:  I think I handed you the wrong one.

8          THE COURT:  Let's switch these out.  Government's 2

9    and 3 will be admitted.

10         MS. VALENZUELA:  Can you describe what is depicted in

11   those photographs?

12         AGENT TILLMAN:  Laminated sheets and black [inaudible]

13   markers.

14         MS. VALENZUELA:  Then in Government's Exhibit 3?

15         AGENT TILLMAN:  A neon yellow notepad or pad.

16         MS. VALENZUELA:  Did the neon yellow or green notepad

17   match the paper that had been posted outside of the business or

18   that flyer you just read from, Exhibit 1?

19         AGENT TILLMAN:  Yes, it does match it.

20         MS. VALENZUELA:  What else, if anything, did the

21   agents recover from the Defendant's motel room?

22         AGENT TILLMAN:  They recovered a report card of the

23   victim, a cell phone, a sheet of paper with the victim's name,

24   Vavra's grandchildren's names, and each name had a monetary

25   amount associated with each name.  There was a grocery like a

1    shopping list that stated several grocery items, and toys.

2    There were also Wet & Wild, the victim's Wet & Wild summer pass

3    as well as a blank Wet & Wild summer pass.

4             MS. VALENZUELA:  How do you know it was the victim's

5    Wet & Wild pass?

6             AGENT TILLMAN:  It had the victim's face and name on

7    it.

8             MS. VALENZUELA:  Did agents ever search the

9    Defendant's tractor trailer?

10            AGENT TILLMAN:  Yes, they did.

11            MS. VALENZUELA:  Was this the same trailer that the

12   Defendant had initially for the first trips in 2015 or was it a

13   different truck?

14            AGENT TILLMAN:  It was a different truck.

15            MS. VALENZUELA:  What, if anything, did agents recover

16   from the Defendant's tractor trailer?

17            AGENT TILLMAN:  They recovered two cell phones, a

18   Battleship board game, another report card of the victim, an

19   index card that Vavra began writing to solicit for help from

20   [inaudible].

21            MS. VALENZUELA:  Your Honor, may I approach with the

22   last exhibit?

23            THE COURT:  Go ahead.

24        Have you seen that Mr. McMahon?

25            MR. McMAHON:  Yes, Your Honor, I have.

1          THE COURT:  All right.

2          MS. VALENZUELA:  You mentioned an index card.  I just

3    handed you Government's Exhibit 4.  Is that a photograph of the

4    index card you were referring to that was recovered from the

5    truck?

6          AGENT TILLMAN:  Yes, it is.

7          MS. VALENZUELA:  Your Honor, at this time, I move to

8    admit Government's Exhibit 4.

9          THE COURT:  Any objection?

10         MR. McMAHON:  No objection.

11         THE COURT:  Government's Exhibit 4 will be admitted.

12         MS. VALENZUELA:  Can you read what that index card

13   states?

14         AGENT TILLMAN:  It reads, "I am looking for a young

15   man to help me part IM" -- it means part-time.

16         MR. McMAHON:  Objection.  Speculation.

17         THE COURT:  Sustained.

18         MS. VALENZUELA:  It was not completed?

19         AGENT TILLMAN:  Correct.

20         MS. VALENZUELA:  Going back to the interview with the

21   victim.  At some point, did the relationship between the victim

22   and the Defendant fall apart basically?

23         AGENT TILLMAN:  Yes, it did.

24         MS. VALENZUELA:  Around what time was that?

25         AGENT TILLMAN:  That was in September or October 2019.

1          MS. VALENZUELA:  Was that because the victim began to

2   refuse the Defendant's advances?

3          MR. McMAHON:  Objection.  Leading.

4          THE COURT:  Sustained.

5          MS. VALENZUELA:  Did that relationship fall apart?

6          AGENT TILLMAN:  Yes.  It was because the victim began

7   refusing Vavra's sexual advances towards him.

8          MS. VALENZUELA:  Did agents obtain consent to review

9   the Defendant's cell phone?

10          AGENT TILLMAN:  Yes.

11          MS. VALENZUELA:  Did agents review the Defendant's

12   cell phone?

13          AGENT TILLMAN:  Yes.

14          MS. VALENZUELA:  Were there messages between the

15   Defendant and the victim on the phone?

16          AGENT TILLMAN:  Yes, there were.

17          MS. VALENZUELA:  Were there messages about the sexual

18   abuse on the phone?

19          AGENT TILLMAN:  Yes.  Made from the victim.

20          MS. VALENZUELA:  What did he say to the Defendant, not

21   verbatim but a summary?

22          AGENT TILLMAN:  The victim stated that he was going to

23   ultimately tell of Vavra's sexual abuse.

24          MS. VALENZUELA:  Did the victim specify what the abuse

25   was on that message?

```
 1              AGENT TILLMAN:  No.  He didn't go into specifics.

 2              MS. VALENZUELA:  May I have a moment?

 3              THE COURT:  Yes.

 4              MS. VALENZUELA:  Nothing further, Your Honor.

 5              THE COURT:  Mr. McMahon?

 6              MR. McMAHON:  Thank you, Your Honor.

 7         Good morning, Agent Tillman.

 8              AGENT TILLMAN:  Good morning.

 9              MR. McMAHON:  Agent Tillman, you started out your

10    testimony by stating that you work for the FBI.  Is that

11    correct?

12              AGENT TILLMAN:  Yes, sir.

13              MR. McMAHON:  Specifically, you work in a division of

14    the FBI that you said investigates crimes against children?

15              AGENT TILLMAN:  Correct.

16              MR. McMAHON:  And you said you have been an FBI agent

17    for nine years?

18              AGENT TILLMAN:  Yes.

19              MR. McMAHON:  Have you spent all of those nine years

20    in the crimes against children division of the FBI?

21              AGENT TILLMAN:  No, I have not.

22              MR. McMAHON:  How long have you been with crimes

23    against children?

24              AGENT TILLMAN:  2.5 years.

25              MR. McMAHON:  For the vast majority of your time at
```

1    the FBI, you have done something else?

2              AGENT TILLMAN:  Other things, yes, sir.

3              MR. McMAHON:  What were the other things?

4              AGENT TILLMAN:  I worked gangs, I worked violent

5    crimes, [inaudible] offenders.

6              MR. McMAHON:  You initially became aware of this case

7    in September, is that right, of 2019?

8              AGENT TILLMAN:  No.  I became aware of this in

9    November 2019.

10             MR. McMAHON:  A month ago?

11             AGENT TILLMAN:  Correct.

12             MR. McMAHON:  How did the case begin being

13   investigated by the FBI?

14             AGENT TILLMAN:  There was an outcry from the victim,

15   and Person No. 1 initially reported it to the Sheriff's Office

16   who, in turn, reported it to the FBI.

17             MR. McMAHON:  You became involved in November,

18   correct?

19             AGENT TILLMAN:  Correct.

20             MR. McMAHON:  When did the FBI become involved in this

21   case?

22             AGENT TILLMAN:  In November.

23             MR. McMAHON:  The outcry was in September?

24             AGENT TILLMAN:  No.

25             MR. McMAHON:  Sorry.  When was the outcry?

 1              AGENT TILLMAN:   The outcry was in November.

 2              MR. McMAHON:   The outcry was in November, okay.   How

 3    long was it investigated by the sheriffs before it went to the

 4    FBI?

 5              AGENT TILLMAN:   I can't say.   I don't know.

 6              MR. McMAHON:   You know the date of the outcry?

 7              AGENT TILLMAN:   Yes.

 8              MR. McMAHON:   And you know the date the FBI became

 9    involved?

10              AGENT TILLMAN:   Yes.

11              MR. McMAHON:   What is the time period between those

12    two dates?

13              AGENT TILLMAN:   The initial report to the

14    Sheriff's Office was the middle of November, and it was

15    referred to us shortly thereafter.

16              MR. McMAHON:   When you, and when I say you, I mean the

17    FBI, when the FBI becomes involved, had the sheriffs already

18    interviewed the complaining witness in this case?

19              AGENT TILLMAN:   Yes.

20              MR. McMAHON:   You have notes of those interviews?

21              AGENT TILLMAN:   Yes.

22              MR. McMAHON:   Those interviews, were they recorded?

23              AGENT TILLMAN:   On paper.   I don't know if they were

24    [inaudible] recorded.   By the Sheriff's Office?

25              MR. McMAHON:   Correct.

1        AGENT TILLMAN:  I don't know their methods.

2        MR. McMAHON:  You don't know their methods?

3        AGENT TILLMAN:  No.

4        MR. McMAHON:  Are you the case agent on this case?

5        AGENT TILLMAN:  Co-case.

6        MR. McMAHON:  Who is the other case agent?

7        AGENT TILLMAN:  [inaudible].

8        MR. McMAHON:  The two of you share information about

9   this case?

10        AGENT TILLMAN:  Right.

11        MR. McMAHON:  Does your co-case agent know the methods

12   that were used by the sheriffs when interviewing the

13   complaining witness?

14        AGENT TILLMAN:  No.

15        MR. McMAHON:  You haven't talked about that?

16        AGENT TILLMAN:  I don't think they have that

17   knowledge.

18        MR. McMAHON:  To start working in crimes against

19   children, you had to receive some special training about

20   dealing with children.  Is that right?

21        AGENT TILLMAN:  Not necessarily.

22        MR. McMAHON:  The FBI didn't teach you about

23   interviewing children as opposed to interviewing your gang

24   members that you dealt with in the other part of your career?

25   There was no training about that?

1          AGENT TILLMAN:  There was training about that, yes.

2          MR. McMAHON:  When you said not necessarily earlier,

3    you meant to say you did get trained specifically for dealing

4    with children.  Is that correct?

5          AGENT TILLMAN:  I did not get trained specifically for

6    dealing with children.  However, we are taught about the

7    methods of how interviews are conducted with children.

8          MR. McMAHON:  How are you taught that?

9          AGENT TILLMAN:  Well, interviews are done -- child

10   interviews are done by [inaudible] by child adolescent

11   [inaudible] interviewer.  The agents don't perform child

12   interviews.

13         MR. McMAHON:  You never interviewed the complaining

14   witness in this case?

15         AGENT TILLMAN:  The victim.

16         MR. McMAHON:  The word you are using is "victim."  So

17   it doesn't confuse you, I am using the term "complaining

18   witness."  Do you understand?

19         AGENT TILLMAN:  Okay.

20         MR. McMAHON:  All right.  So, you never interviewed

21   the complaining witness in this case?

22         AGENT TILLMAN:  No.

23         MR. McMAHON:  But the FBI has had a child advocate

24   interview the complaining witness?

25         AGENT TILLMAN:  Correct.

1          MR. McMAHON:  And you seen a recording of that

2    interview?

3          AGENT TILLMAN:  Correct.

4          MR. McMAHON:  And you still have that recording?

5          AGENT TILLMAN:  Right.

6          MR. McMAHON:  Still preserved in your files?

7          AGENT TILLMAN:  Correct.

8          MR. McMAHON:  I understand that once the initial

9    outcry was given, it was given to a Person No. 1.  Is that who

10   the outcry went to?

11         AGENT TILLMAN:  Initially, it was given to another

12   relative.

13         MR. McMAHON:  Another relative of complaining witness?

14         AGENT TILLMAN:  Yes.

15         MR. McMAHON:  Then did the other relative go to

16   Person No. 1 or did complaining witness go to Person No. 1?

17         AGENT TILLMAN:  The other relative went to

18   Person No. 1.

19         MR. McMAHON:  And Person No. 1 speaks with complaining

20   witness.  Is that correct?

21         AGENT TILLMAN:  Right.

22         MR. McMAHON:  When Person No. 1 does that, does

23   complaining witness immediately say yes, this is true or is

24   there an initial denial of whether or not the sexual abuse that

25   was reported had occurred?

1              AGENT TILLMAN:   The victim told Person No. 1 that the

2    sexual abuse occurred.

3              MR. McMAHON:   Immediately?

4              AGENT TILLMAN:   Upon initial questioning.

5              MR. McMAHON:   When the complaining witness first met

6    my client, complaining witness was nine years old.   Is that

7    right?

8              AGENT TILLMAN:   Yes.

9              MR. McMAHON:   That was in response to a flyer that

10   purported to offer Wet & Wild tickets for free?

11             AGENT TILLMAN:   Season passes.

12             MR. McMAHON:   Season passes?

13             AGENT TILLMAN:   Yes.

14             MR. McMAHON:   To get into the park?

15             AGENT TILLMAN:   Yes.

16             MR. McMAHON:   For free?

17             AGENT TILLMAN:   Yes.

18             MR. McMAHON:   At that meeting -- so, Person No. 1

19   calls my client and says we are interested in these free

20   tickets, and they meet somewhere.   Is that right?

21             AGENT TILLMAN:   Yes.

22             MR. McMAHON:   Where do they meet?

23             AGENT TILLMAN:   At the Pilot Gas Station in Anthony.

24             MR. McMAHON:   Is it the one that has the McDonald's

25   attached to it?

1    AGENT TILLMAN:  [inaudible].

2    MR. McMAHON:  You haven't been up there?  At that

3 meeting, my client does indeed give Wet & Wild passes to

4 Person No. 1.  Is that right?

5    AGENT TILLMAN:  Correct.

6    MR. McMAHON:  There was some conversation at that

7 meeting about the complaining witness accompanying my client on

8 some of his trips he takes as a truck driver.  Is that right?

9    AGENT TILLMAN:  Yes.

10    MR. McMAHON:  Who initiated that conversation about

11 taking those trips at that meeting?

12    AGENT TILLMAN:  I would say your client.

13    MR. McMAHON:  Well, when you say I would say, it makes

14 me think you're not sure.  If you know, and only if you know --

15    AGENT TILLMAN:  I don't know.

16    MR. McMAHON:  Okay.  The conversation at that time

17 from what I understand is my client is saying look, I am a

18 truck driver, I see many states, I see many cities, and if your

19 son is interested in seeing the world, he could come along with

20 me.  Is that right?

21    AGENT TILLMAN:  Correct.

22    MR. McMAHON:  Person No. 1 agrees at that point or has

23 to think about it, if you know?

24    AGENT TILLMAN:  Yes.  Person No. 1 thinks about it.

25    MR. McMAHON:  After some time of thinking about it,

1   Person No. 1 calls my client and says look, we think that

2   taking you up on this is something we might be interested in?

3              AGENT TILLMAN:  Correct.

4              MR. McMAHON:  Are there details that are provided back

5   and forth about where they are going, how long they will be

6   gone?  Were those kinds of conversations -- are they had before

7   the trips are taken?

8              AGENT TILLMAN:  That information I don't know.

9              MR. McMAHON:  You didn't ask Person No. 1 about that?

10             AGENT TILLMAN:  I don't know.

11             MR. McMAHON:  The first trip then is in July 2015.  Is

12  that right?

13             AGENT TILLMAN:  Correct.

14             MR. McMAHON:  When was the meeting at the gas station

15  for the season passes?

16             AGENT TILLMAN:  July 2015.

17             MR. McMAHON:  How many days elapsed between that

18  meeting and the first trip?

19             AGENT TILLMAN:  Depending on the person interviewed,

20  between zero days and three days.

21             MR. McMAHON:  When you say depends who you interview,

22  what do you mean by that?

23             AGENT TILLMAN:  Your client, Vavra, states one date

24  [inaudible] to leave.  Person No. 1 states a different date,

25  and the victim states a different date.  [inaudible] four years

1   ago.

2          MR. McMAHON:  Three possible days.  Is that right?

3          AGENT TILLMAN:  Yes [inaudible] three days.

4          MR. McMAHON:  One of them said zero days, and one of

5   the three says that the trip started that same day?

6          AGENT TILLMAN:  Correct.

7          MR. McMAHON:  Which person was that?

8          AGENT TILLMAN:  Your client.

9          MR. McMAHON:  You know the trucking company that my

10  client works for?

11         AGENT TILLMAN:  Yes.

12         MR. McMAHON:  Have you asked for, and I know it is

13  some time back, but have you asked whether or not the gas

14  station has video camera footage, security footage, from that

15  date from July 2015?

16         AGENT TILLMAN:  No.

17         MR. McMAHON:  You haven't gone to the gas station to

18  ask?

19         AGENT TILLMAN:  [inaudible].

20         MR. McMAHON:  Have you gone to my client's trucking

21  company to confirm that he actually did have a job to do truck

22  driving -- trucking job in July 2015?

23         AGENT TILLMAN:  That's an investigative matter we are

24  currently working on right now.

25         MR. McMAHON:  I don't understand your answer.  Can you

1    tell me what you're trying to say?

2          AGENT TILLMAN:  We are obtaining that information.

3          MR. McMAHON:  You don't have it yet?

4          AGENT TILLMAN:  That's correct.

5          MR. McMAHON:  And you can't tell, for example,

6    Judge Berton you know there was a trip taken that day yet?

7          AGENT TILLMAN:  Correct.

8          MR. McMAHON:  You are working on it?

9          AGENT TILLMAN:  Yes.

10          MR. McMAHON:  Have you confirmed that in 2015 my

11   client was indeed a truck driver with an 18 wheeler truck he

12   actually was using for jobs?

13          AGENT TILLMAN:  No.

14          MR. McMAHON:  Any reason to doubt it?

15          AGENT TILLMAN:  No.

16          MR. McMAHON:  This first trip is going from

17   Anthony, Texas, to Chicago, Illinois, and there is a stop in

18   Joplin, Missouri.  Is that correct?

19          AGENT TILLMAN:  Correct.

20          MR. McMAHON:  Joplin, Missouri, is the first stop so

21   they drive from Anthony straight to Joplin?

22          AGENT TILLMAN:  I don't know if there were stops in

23   between.  It was a stop.

24          MR. McMAHON:  The reason why this stop was important

25   to your testimony is that you said that my client and the

1    complaining witness took a shower together?

2            AGENT TILLMAN:  Correct.

3            MR. McMAHON:  That information came from the

4    complaining witness?

5            AGENT TILLMAN:  Correct.

6            MR. McMAHON:  You don't have video of a truck stop in

7    Joplin watching them walk together into a shower for example?

8            AGENT TILLMAN:  No.

9            MR. McMAHON:  Did you ask my client about this shower

10   that the complaining witness talked about?

11           AGENT TILLMAN:  Yes.

12           MR. McMAHON:  My client said that never happened?

13           AGENT TILLMAN:  Correct.

14           MR. McMAHON:  He said it did happen?

15           AGENT TILLMAN:  Your client did say they did take

16   showers together.

17           MR. McMAHON:  They did take showers together?

18           AGENT TILLMAN:  Correct.

19           MR. McMAHON:  At truck stops?

20           AGENT TILLMAN:  Correct.

21           MR. McMAHON:  When you say showers together, because

22   at truck stops there is a room you go into, and there is a

23   shower and changing area.  Have you seen these?

24           AGENT TILLMAN:  I have never been to a truck stop

25   shower, sir.

1          MR. McMAHON:  Did you ask the complaining witness
2    whether or not they were in the same shower area together or
3    whether or not they were actually under the running water
4    together?
5          AGENT TILLMAN:  Yes, sir, I did ask.
6          MR. McMAHON:  The complaining witness said what?
7          AGENT TILLMAN:  They were in the same shower area
8    essentially the same running water together.
9          MR. McMAHON:  It is two different things.  What I am
10   using for shower area, I am using the entire area to include an
11   area for dressing.  A shower has a curtain ordinarily?
12         AGENT TILLMAN:  Yes.
13         MR. McMAHON:  Did you ask the complaining witness if
14   they were on the water side of the curtain together?
15         AGENT TILLMAN:  Yes.
16         MR. McMAHON:  The complaining witness said what?
17         AGENT TILLMAN:  They were.
18         MR. McMAHON:  Did you ask with that specificity to my
19   client what he said about that?
20         AGENT TILLMAN:  Yes.
21         MR. McMAHON:  You asked if they were under the water
22   together?
23         AGENT TILLMAN:  Yes.
24         MR. McMAHON:  And this conversation you had with my
25   client was recorded, right?

```
 1                AGENT TILLMAN:  Yes.

 2                MR. McMAHON:  What did my client say?

 3                AGENT TILLMAN:  Your client said that your client

 4     would be actually taking a shower while the victim would be on

 5     the other side of the curtain.

 6                MR. McMAHON:  My client said they were not taking a

 7     shower in terms of getting wet together, and they were

 8     separated at those points, right, and he just had the

 9     complaining witness in the same area at a truck stop shower

10     area, right?

11                AGENT TILLMAN:  Correct.

12                MR. McMAHON:  Also at that stop in Joplin Missouri,

13     there was talk of $100 and a cell phone.  Is that right?

14                AGENT TILLMAN:  At that stop?

15                MR. McMAHON:  Isn't it right after that stop --

16                AGENT TILLMAN:  It was after the trip was completed.

17                MR. McMAHON:  After the trip was completed?  Okay, so

18     after the Joplin, Missouri, stop, the two go to Chicago.  Is

19     that right?

20                AGENT TILLMAN:  Correct.

21                MR. McMAHON:  And came all the way back to

22     Anthony, Texas?

23                AGENT TILLMAN:  Correct.

24                MR. McMAHON:  With more stops along the way?

25                AGENT TILLMAN:  I don't know.
```

1          MR. McMAHON:  Well, they stopped for gas, right?

2          AGENT TILLMAN:  I would imagine.

3          MR. McMAHON:  Stopped to eat?

4          AGENT TILLMAN:  I would imagine.

5          MR. McMAHON:  Stopped to sleep?

6          AGENT TILLMAN:  I would imagine.

7          MR. McMAHON:  No allegations that anything else

8   inappropriate happened on that trip?

9          AGENT TILLMAN:  Not on that trip.

10          MR. McMAHON:  The second trip was a few months later

11   in September.  Is that right?

12          AGENT TILLMAN:  Yes.

13          MR. McMAHON:  How is complaining witness able to take

14   a trip in September during school time?

15          AGENT TILLMAN:  I don't know.

16          MR. McMAHON:  You didn't ask?

17          AGENT TILLMAN:  No.

18          MR. McMAHON:  You didn't ask complaining witness?

19          AGENT TILLMAN:  No.

20          MR. McMAHON:  You didn't ask Person No. 1?

21          AGENT TILLMAN:  Correct.

22          MR. McMAHON:  Have you gone to complaining witness's

23   schools to see if there were absences in September 2015?

24          AGENT TILLMAN:  [inaudible].

25          MR. McMAHON:  If you did that though, it could have

1    corroborated complaining witness's story, right?

2          AGENT TILLMAN:  Correct.

3          MR. McMAHON:  The second trip is from Anthony, and you

4    said to California.  Is that right?

5          AGENT TILLMAN:  Correct.

6          MR. McMAHON:  Where in California?

7          AGENT TILLMAN:  I don't know the city.

8          MR. McMAHON:  You didn't ask?

9          AGENT TILLMAN:  The victim didn't specify.

10         MR. McMAHON:  You didn't ask?

11         AGENT TILLMAN:  No.  Again, I was not there for the

12    interview.

13         MR. McMAHON:  The interviewer didn't ask?

14         AGENT TILLMAN:  Correct.

15         MR. McMAHON:  Did you ask Person No. 1 what city

16    complaining witness was going to in California?

17         AGENT TILLMAN:  No.

18         MR. McMAHON:  Did you ask Person No. 1 if Person No. 1

19    even knew or cared?

20         AGENT TILLMAN:  Yes.

21         MR. McMAHON:  What was the answer to that?

22         AGENT TILLMAN:  Person No. 1 was uncertain as to the

23    destinations.

24         MR. McMAHON:  Along the way -- was it to California

25    the Arizona incident happened or on the way back?

1          AGENT TILLMAN:  I'm not sure.

2          MR. McMAHON:  Either going towards California, or

3    coming back from California, there was an incident that you

4    described as the first sexual assault.  Is that right?

5          AGENT TILLMAN:  Correct.

6          MR. McMAHON:  In the first sexual assault, as you

7    describe it, there is an allegation that my client performed

8    oral sex on the complaining witness.  Is that right?

9          AGENT TILLMAN:  Correct.

10         MR. McMAHON:  Where did that alleged incident occur?

11         AGENT TILLMAN:  In the [inaudible] of the truck.

12         MR. McMAHON:  Was it during a nighttime we are resting

13   for the night stop?

14         AGENT TILLMAN:  Yes.  When everyone -- while going to

15   sleep.

16         MR. McMAHON:  While going to sleep in the same

17   sleeping area?

18         AGENT TILLMAN:  Correct.

19         MR. McMAHON:  Have you seen the truck, the sleeping

20   area?

21         AGENT TILLMAN:  I have not seen it.

22         MR. McMAHON:  Have you seen pictures of it?

23         AGENT TILLMAN:  I have not.

24         MR. McMAHON:  Has anyone in the FBI taken pictures of

25   it?

```
 1                AGENT TILLMAN:  That truck was a different truck than
 2   the one your client [inaudible].
 3                MR. McMAHON:  Nobody seen that truck?
 4                AGENT TILLMAN:  Correct.
 5                MR. McMAHON:  You don't know where it is?
 6                AGENT TILLMAN:  I don't know.
 7                MR. McMAHON:  Did you ask my client about whether or
 8   not this occurred?
 9                AGENT TILLMAN:  Yes.
10                MR. McMAHON:  My client denied this happened?
11                AGENT TILLMAN:  Correct.
12                MR. McMAHON:  So, there is no physical evidence that
13   corroborates that such an incident actually occurred, is there?
14                AGENT TILLMAN:  Correct.
15                MR. McMAHON:  And there is no eyewitness evidence that
16   such an incident occurred outside of the complaining witness?
17                AGENT TILLMAN:  Correct.
18                MR. McMAHON:  On this trip, complaining witness had a
19   cell phone?
20                AGENT TILLMAN:  Yes.
21                MR. McMAHON:  There were no text messages or phone
22   calls following this incident from the complaining witness
23   saying this just happened to me, correct?
24                AGENT TILLMAN:  Correct.
25                MR. McMAHON:  Didn't call mom and dad and say I need
```

```
 1    help, I was just assaulted?
 2              AGENT TILLMAN:  No.
 3              MR. McMAHON:  Didn't text any of his friends from
 4    school?
 5              AGENT TILLMAN:  To my knowledge, no.
 6              MR. McMAHON:  On the second trip, this one alleged
 7    incident is the only allegation of sexual assault that
 8    occurred.  Is that right?
 9              AGENT TILLMAN:  No.
10              MR. McMAHON:  Okay.  By on this trip, I am talking
11    about this trip to California.
12              AGENT TILLMAN:  No, it is incorrect.
13              MR. McMAHON:  What are the other allegations?
14              AGENT TILLMAN:  The victim was ordered back after the
15    [inaudible] initial sexual assault.  It occurred every time
16    after they were going to sleep.
17              MR. McMAHON:  How many times did they go to sleep
18    following that first incident?
19              AGENT TILLMAN:  I don't know.
20              MR. McMAHON:  You didn't ask?
21              AGENT TILLMAN:  No.
22              MR. McMAHON:  Do you have an approximate number of
23    alleged sexual assault encounters that occurred on the second
24    trip?
25              AGENT TILLMAN:  No [inaudible].
```

1            MR. McMAHON:  Following the subsequent alleged sexual

2    assault incidents that occurred on that second trip, in the

3    same way there was no text messages or calls from the first

4    one, there were no text messages or calls from any of the

5    subsequent ones too?

6            AGENT TILLMAN:  Right.

7            MR. McMAHON:  After returning home from that trip, is

8    there any report from Person No. 1, or any other relative, of

9    complaining witness that he was in any way acting differently

10   or strangely?

11           AGENT TILLMAN:  No -- yes.  Acting differently, yes.

12           MR. McMAHON:  Tell me about that.

13           AGENT TILLMAN:  The victim did not want to

14   [inaudible].  Victim was excited to have been away on the trip

15   and wanted to continue traveling with [inaudible].

16           MR. McMAHON:  When you say victim did not want to

17   return home, it was strange how?

18           AGENT TILLMAN:  Specifically, it was different

19   behavior because he had never traveled like that before.

20           MR. McMAHON:  The strange behavior was being excited

21   after the trip to California?

22           AGENT TILLMAN:  Correct.

23           MR. McMAHON:  Apart from that, are there any other

24   reports from family members that complaining witness was acting

25   strangely or differently?

1              AGENT TILLMAN:  No.

2              MR. McMAHON:  In October 2015, a third trip -- you

3     testified about a third trip.  Is that right?

4              AGENT TILLMAN:  Yes.

5              MR. McMAHON:  This is a trip between Anthony and

6     Wisconsin?

7              AGENT TILLMAN:  Correct.

8              MR. McMAHON:  Is it fair to say that you haven't

9     checked the attendance records of complaining witness from

10    October 2015 either?

11             AGENT TILLMAN:  Correct.

12             MR. McMAHON:  On this trip, there is a stop in

13    Belvedere, Illinois.  Is that right?

14             AGENT TILLMAN:  Correct.

15             MR. McMAHON:  Does my client and the complaining

16    witness, do they make any stops to sleep between Anthony and

17    Belvedere, Illinois?

18             AGENT TILLMAN:  I don't know.

19             MR. McMAHON:  You didn't ask?

20             AGENT TILLMAN:  No.

21             MR. McMAHON:  But there is no reports of any alleged

22    sexual encounters between Anthony and Belvedere, Illinois.  Is

23    that right?

24             AGENT TILLMAN:  Right.

25             MR. McMAHON:  On this trip at Belvedere, there is not

1   an allegation by the complaining witness that my client forced

2   the complaining witness to perform oral sex on my client.  Is

3   that correct?

4           AGENT TILLMAN:  Correct.

5           MR. McMAHON:  I believe when you testified that you

6   used the word "forced?"

7           AGENT TILLMAN:  Right.

8           MR. McMAHON:  Where does the word "forced" come from?

9   How did you come to the conclusion it was a forced encounter?

10          AGENT TILLMAN:  It was the victim's term.

11          MR. McMAHON:  Complaining witness said I was forced to

12  do this?

13          AGENT TILLMAN:  The victim stated that Vavra forced

14  him to perform oral sex on Vavra.

15          MR. McMAHON:  What details, if any, were given about

16  the nature of that force?

17          AGENT TILLMAN:  Vavra grabbed victim's head, and

18  pushed it to Vavra's penis, and forced him to perform oral sex

19  on Vavra.

20          MR. McMAHON:  When you say perform oral sex, you're

21  saying that the allegation is mouth on penis or I am going to

22  do this until there is ejaculate?

23          AGENT TILLMAN:  Mouth on penis fellatio.  The victim

24  stated that the victim eventually pulled away, and Vavra

25  continued to masturbate until he ejaculated into Vavra's own

 1    hand and wiped his hand off with a paper towel.

 2           MR. McMAHON:  You got all of that detail from the

 3    complaining witness?

 4           AGENT TILLMAN:  Right.

 5           MR. McMAHON:  In this alleged sexual encounter, you

 6    don't have any physical evidence to support these claims by the

 7    complaining witness.  Is that right?

 8           AGENT TILLMAN:  Right.

 9           MR. McMAHON:  No DNA evidence?

10           AGENT TILLMAN:  No.

11           MR. McMAHON:  And there is no pictures of markings on

12    complaining witness's head or anything like that?

13           AGENT TILLMAN:  No.

14           MR. McMAHON:  Following this alleged sexual assault,

15    is there any attempt by the complaining witness to call anyone

16    and report it?

17           AGENT TILLMAN:  No.

18           MR. McMAHON:  Is there any attempt by the complaining

19    witness to send text messages to anyone and report it?

20           AGENT TILLMAN:  No.

21           MR. McMAHON:  I believe the Government at this point

22    asked you about subsequent trips to this third trip.  Is that

23    right?

24           AGENT TILLMAN:  Yes.

25           MR. McMAHON:  You said there are several?

1            AGENT TILLMAN:  Yes.

2            MR. McMAHON:  When you say several, do you have a

3   number?  Is there a way for you to approximate what we are

4   looking at here?

5            AGENT TILLMAN:  It was listed in the complaint of the

6   various states they traveled to, and during the victim's

7   interview.  I don't remember the states offhand.

8            MR. McMAHON:  You don't know how many there were?

9            AGENT TILLMAN:  No.

10           MR. McMAHON:  You have all of that written down

11   somewhere?

12           AGENT TILLMAN:  In the complaint.

13           MR. McMAHON:  Apart from the complaint, you have it

14   written down in your own investigative files?

15           AGENT TILLMAN:  Correct.

16           MR. McMAHON:  It is information you got from the

17   complaining witness?

18           AGENT TILLMAN:  Correct.

19           MR. McMAHON:  How many allegations of sexual assaults

20   are there in those subsequent trips, the several trips?

21           AGENT TILLMAN:  I can't place a number on it, but the

22   victim stated that, again, every time they slept together, the

23   sexual assault would occur.

24           MR. McMAHON:  Are we talking about the same types of

25   sexual assaults that you already testified about?

1              AGENT TILLMAN:  Yes.

2              MR. McMAHON:  No additional variations of sexual

3    assaults?

4              AGENT TILLMAN:  The victim stated that Vavra forced

5    victim to perform oral sex on Vavra a maximum of about five

6    times throughout the four year period.

7              MR. McMAHON:  The question is whether or not there

8    were any other variations or types, for example, forced anal

9    sex?  It is just an example.  Is there any other types of

10   sexual assaults alleged by the complaining witness?

11             AGENT TILLMAN:  Yes.  The victim also stated that

12   Vavra attempted to stick his penis in the victim's anus but

13   never penetrated.

14             MR. McMAHON:  For all of the subsequent allegations

15   that we haven't talked about yet but that are included in these

16   trips, for all the subsequent allegations of sexual assault, do

17   you have any physical evidence that supports what the

18   complaining witness is saying?

19             AGENT TILLMAN:  No.

20             MR. McMAHON:  Are there any calls that the complaining

21   witness makes after any one of these alleged sexual assaults?

22             AGENT TILLMAN:  No.

23             MR. McMAHON:  Are there any text messages that are

24   sent by the complaining witness following any one of these

25   sexual assaults?

```
 1                    AGENT TILLMAN:  No.
 2                    MR. McMAHON:  During the course of what you described
 3      as a relationship between my client and the complaining
 4      witness, my client also became friendly with the family.  Is
 5      that correct?
 6                    AGENT TILLMAN:  That's correct.
 7                    MR. McMAHON:  With mom and with dad?
 8                    AGENT TILLMAN:  Correct.
 9                    MR. McMAHON:  You testified that my client was seen as
10      a grandfather like figure to the complaining witness?
11                    AGENT TILLMAN:  Correct.
12                    MR. McMAHON:  Bought him video games?
13                    AGENT TILLMAN:  Correct.
14                    MR. McMAHON:  Cell phones?
15                    AGENT TILLMAN:  Yes.
16                    MR. McMAHON:  Paid his bills?
17                    AGENT TILLMAN:  Yes.
18                    MR. McMAHON:  What kind of bills does a child have?
19      What kind of bills were being paid?
20                    AGENT TILLMAN:  Household bills.
21                    MR. McMAHON:  He was helping the family?
22                    AGENT TILLMAN:  Yes.
23                    MR. McMAHON:  Clothes?
24                    AGENT TILLMAN:  Yes.
25                    MR. McMAHON:  The credit card and debit card you
```

1   talked about, do you have those?  Was it seized as part of the

2   evidence in this case?

3          AGENT TILLMAN:  We may.  I don't remember specifically

4   if we have which credit cards.

5          MR. McMAHON:  The credit cards and debit cards you

6   were talking about are in my client's name?

7          AGENT TILLMAN:  Correct.

8          MR. McMAHON:  They were not, for example, a separate

9   account was not opened with complaining witness's information,

10  right?

11         AGENT TILLMAN:  Correct.  It was all under Vavra's

12  name.

13         MR. McMAHON:  My client's credit card he would lend to

14  the family to pay for things?

15         AGENT TILLMAN:  He gave it to the family.

16         MR. McMAHON:  It wasn't just to complaining witness.

17  It was to other members of the family?

18         AGENT TILLMAN:  More specifically to the victim.

19         MR. McMAHON:  Also some of the other family members

20  would use that money?  If you know.  It is okay to say you

21  don't know if you don't know.

22         AGENT TILLMAN:  I don't know.

23         MR. McMAHON:  All right.  My client and complaining

24  witness would communicate directly with each other?

25         AGENT TILLMAN:  Sorry?

1            MR. McMAHON:   They would communicate via text message

2    directly with each other?

3            AGENT TILLMAN:   Yes.

4            MR. McMAHON:   And would communicate via phone

5    conversations directly with each other?

6            AGENT TILLMAN:   Yes.

7            MR. McMAHON:   And you have many of those conversations

8    preserved, is that right, the text messages?

9            AGENT TILLMAN:   The text messages, yes.

10           MR. McMAHON:   As you go through the text messages, are

11   there any places where it looks like sections of the

12   conversations have been deleted by anyone?

13           AGENT TILLMAN:   No.

14           MR. McMAHON:   The conversations seem to fall

15   naturally?

16           AGENT TILLMAN:   Right.

17           MR. McMAHON:   In those conversations, there is no

18   sexually explicit conversation by my client?

19           AGENT TILLMAN:   No.

20           MR. McMAHON:   Nothing that says anything along the

21   lines of talking about physical interaction with the

22   complaining witness?

23           AGENT TILLMAN:   No.

24           MR. McMAHON:   What about on behalf of the complaining

25   witness?   Anything sexually explicit on behalf of complaining

1   witness?

2          AGENT TILLMAN:  [inaudible].

3          MR. McMAHON:  Anything referencing physical contact

4   between complaining witness and my client?

5          AGENT TILLMAN:  Up until the allegations, no.

6          MR. McMAHON:  Prior to the outcry in this case, there

7   was some text messages by complaining witness that essentially

8   said something along the lines of I am going to report you.

9   Did I understand that correctly?

10         AGENT TILLMAN:  Yes.

11         MR. McMAHON:  You have those, and they are preserved?

12         AGENT TILLMAN:  Yes.

13         MR. McMAHON:  What, if anything, immediately preceded

14  those in the text messages conversation?  Was there an argument

15  or did it look like the two were fighting about anything?

16         AGENT TILLMAN:  There was in the text message -- I

17  don't remember specifically, but it was in the text message

18  though.

19         MR. McMAHON:  What was the argument about?

20         AGENT TILLMAN:  Because Vavra disconnected the

21  victim's cell phone.

22         MR. McMAHON:  Complaining witness was not happy that

23  complaining witness's cell phone had been disconnected?

24         AGENT TILLMAN:  Correct.

25         MR. McMAHON:  As a result, complaining witness said

1    I'm going to report you for touching me?

2             AGENT TILLMAN:  More or less, yes.

3             MR. McMAHON:  Do you remember exactly what was said?

4             AGENT TILLMAN:  I don't remember exactly.

5             MR. McMAHON:  That's the gist of it?

6             AGENT TILLMAN:  Yes.

7             MR. McMAHON:  What, if anything, did my client reply

8    to that text or those texts by the complaining witness?

9             AGENT TILLMAN:  Vavra stated it is not true or

10   something to the effect of don't tell lies or don't spread

11   lies.

12            MR. McMAHON:  Do you remember the questions I asked

13   you earlier about whether or not the complaining witness was

14   acting different after the alleged sexual assault incidents we

15   spoke about?

16            AGENT TILLMAN:  Yes.

17            MR. McMAHON:  I want to ask that question about all of

18   the subsequent trips that were taken.  Remember we grouped

19   those together?

20            AGENT TILLMAN:  Yes.

21            MR. McMAHON:  Was there any indication that following

22   any of those subsequent trips that complaining witness was

23   acting differently over the course of all of that time those

24   trips were taken?

25            AGENT TILLMAN:  No.

1          MR. McMAHON:  During all the time the trips are being

2    taken, does the complaining witness tell any of his friends

3    outside of his family, at school, karate, baseball team or

4    anything like that, does complaining witness tell anybody

5    outside of his family that any of this has happened?

6          AGENT TILLMAN:  No.

7          MR. McMAHON:  On the day that my client is arrested,

8    he is the subject of surveillance.  Is that correct?

9          AGENT TILLMAN:  Correct.

10          MR. McMAHON:  Is the reason you were surveilling my

11    client linked to the outcry by complaining witness?

12          AGENT TILLMAN:  Yes.

13          MR. McMAHON:  No independent investigation apart from

14    that?

15          AGENT TILLMAN:  No.

16          MR. McMAHON:  In fact, neither your agency nor the

17    sheriffs agency had received any other types of complaints like

18    this about my client?

19          AGENT TILLMAN:  Correct.

20          MR. McMAHON:  You are watching my client, and the

21    reason you decide to arrest him is because he is going into a

22    mall?

23          AGENT TILLMAN:  Correct.

24          MR. McMAHON:  You testified that the reason you jumped

25    in and arrested him is because he might be out there scouting

1    for, I think, you said more victims?

2          AGENT TILLMAN:  Right.

3          MR. McMAHON:  You have absolutely no evidence to

4    support that.  Isn't that right?

5          AGENT TILLMAN:  Correct.

6          MR. McMAHON:  After my client is arrested, he is

7    Mirandized.  Is that right?

8          AGENT TILLMAN:  Yes.

9          MR. McMAHON:  Where did that Miranda warning take

10   place?

11         AGENT TILLMAN:  In our room at the FBI building.

12         MR. McMAHON:  At the FBI building, okay.  My client

13   doesn't say I want a lawyer present.  He said look, I'm willing

14   to talk to you?

15         AGENT TILLMAN:  Correct.

16         MR. McMAHON:  And essentially said yes, I have been

17   taking this kid on these trips, but nothing inappropriate ever

18   happened?

19         AGENT TILLMAN:  That's what he said, yes.

20         MR. McMAHON:  In the course of questioning, my client

21   eventually said look, we have wrestled before.  Is that right?

22         AGENT TILLMAN:  Yes.

23         MR. McMAHON:  In the course of wrestling with the

24   child, my hand might have touched his butt, right?

25         AGENT TILLMAN:  He didn't specify what body part.

1          MR. McMAHON:  You did though.  When you testified, you

2   specified two body parts, right?  You said anus, and you said

3   penis?

4          AGENT TILLMAN:  Correct.

5          MR. McMAHON:  Are those words my client used?

6          AGENT TILLMAN:  No.  The victim.

7          MR. McMAHON:  Complaining witness said that?

8          AGENT TILLMAN:  Yes.

9          MR. McMAHON:  You don't have any physical evidence

10  that occurred?

11         AGENT TILLMAN:  No.

12         MR. McMAHON:  My client never admitted that occurred?

13         AGENT TILLMAN:  Your client stated it might have.

14         MR. McMAHON:  Sure.  In the course of wrestling, his

15  hand might have touched parts of the boy, right?

16         AGENT TILLMAN:  He didn't say what part of his body

17  and your client's body.

18         MR. McMAHON:  What did he say?  When he said it might

19  have happened, what did he say might have happened?

20         AGENT TILLMAN:  He stated he might have touched the

21  victim's anus and might have touched the victim's penis.

22         MR. McMAHON:  Is this in response to you using the

23  complaining witness's words like hey, the kid is saying you

24  touched his anus and penis while you were wrestling?

25         AGENT TILLMAN:  No.  I asked if Vavra has ever touched

1    victim's anus or penis.

2         MR. McMAHON:  And he said look, it might have been

3    incidentally while we were wrestling?

4         AGENT TILLMAN:  Correct.

5         MR. McMAHON:  But I was not intending to do it, right?

6    Did he say that?

7         AGENT TILLMAN:  I don't remember his exact words.

8         MR. McMAHON:  It was described as incidental in

9    relation to wrestling?

10        AGENT TILLMAN:  Right.

11        MR. McMAHON:  In fact, my client said I don't know if

12   it happened, but if it did happen, that's when it might have

13   happened, right?

14        AGENT TILLMAN:  Yes.

15        MR. McMAHON:  When you conducted a search of my

16   client's truck, you didn't find any physical evidence to

17   support the allegations by the complaining witness.  Is that

18   right?

19        AGENT TILLMAN:  Correct.

20        MR. McMAHON:  When you conducted a search of my

21   client's room at the La Quinta, and at the time my client was

22   using that as his residence.  Is that right?

23        AGENT TILLMAN:  Right.

24        MR. McMAHON:  When you conducted a search of that

25   hotel room, you didn't find any physical evidence to support

1  sexual abuse claims by the complaining witness.  Is that right?

2       AGENT TILLMAN:  Correct.

3       MR. McMAHON:  You did find some notes.  Is that right?

4       AGENT TILLMAN:  Yes.

5       MR. McMAHON:  There is nothing inherently illegal

6  about anything you found in these notes?

7       AGENT TILLMAN:  No.

8       MR. McMAHON:  At the end of all of this, the only

9  evidence you have that any of this occurred is the word of the

10  complaining witness.  Is that right?

11       AGENT TILLMAN:  Correct.

12       MR. McMAHON:  And you don't have any other evidence at

13  all to support any of these claims.  Is that fair to say?

14       AGENT TILLMAN:  Correct.

15       MR. McMAHON:  Your Honor, I have no further questions.

16       THE COURT:  Ms. Valenzuela, any other questions for

17  this witness?

18       MS. VALENZUELA:  One moment, Your Honor.

19     No further questions, Your Honor.

20       THE COURT:  Agent, you may be excused.

21     Any other witnesses or evidence from the Government?

22       MS. VALENZUELA:  No, Your Honor.

23       THE COURT:  Mr. McMahon, any witnesses or evidence?

24       MR. McMAHON:  No, Your Honor.

25       THE COURT:  Any argument, Ms. Valenzuela?

1            MS. VALENZUELA:  I will reserve argument, Your Honor.

2            THE COURT:  Mr. McMahon?

3            MR. McMAHON:  Your Honor, I am going to make an

4    argument as it relates to bond although I do want to touch upon

5    probable cause.

6        I am not going to say there is no probable cause here

7    because at this stage I recognize that we have to view the

8    evidence that was presented, but what worries me about this

9    case is the lack of any type of evidence to support these

10   claims apart from the word of a complaining witness who was

11   angry that his cell phone had been shutoff.

12       I bring that up because it carries into the strength of the

13   case which I think we have to talk about as it relates to

14   whether or not the Court is going to hold my client detained

15   while the case proceeds to an eventual trial.  It does seem

16   like there are conditions and combination of conditions that

17   this Court can use to assure my client's presence in court, but

18   there is absolutely no indication that my client would ever be

19   a flight risk.

20       My client lives in this community, has lived here 38 years.

21   My client has what he calls his wife, and it is a long term

22   relationship with a woman who lives here in the community.  His

23   daughter lives in Albuquerque, and his ties are to this area of

24   the country.  He is not going to run and not going to go to

25   Mexico to try to run from these charges.  He is denying these

1    charges and wants to clear his name and fight these charges.

2    There is no indication that there ever has been any kind of an

3    allegation like this against my client by anyone ever before

4    this.  My client has a job.  He is a trucker and anxious to get

5    back out and work with his truck.

6         Now, candidly, these are horrifying accusations.  I

7    understand that, and I can certainly understand that if these

8    allegations were true that the Court would find good reason to

9    keep my client detained.  We don't have any evidence outside of

10   an essentially he said/he said scenario.  And, in fact,  we

11   have a motive for the complaining witness to want to get back

12   at my client, and the Court knows well how these things go.

13        Once you say it once, and the constables come in, and the

14   sheriffs come in, and the FBI comes in, and you keep telling

15   the story.  When you are a kid, you have to stay with the

16   story.  Otherwise, you get in trouble.  It sounds based on the

17   evidence there is at least an argument to be made that the

18   reason why the complaining witness did this is because for that

19   reason.  He was very angry.  We don't know.

20        The process will play itself out, right?  There will be

21   more evidence coming from the Government and more work done on

22   behalf of the Defense.  We may well -- if the Government

23   doesn't dismiss this case, we may well have a trial based on

24   the evidence that this agent says they are still looking into

25   which is also problematic.  The FBI hasn't completed its job.

 1    We don't have all the information yet.

 2        For this Court to take somebody with no criminal history at

 3    all, and for this Court to take somebody who has no history of

 4    failing to appear for anything, even a parking ticket in his

 5    life, it seems like an overreaction because of the nature of

 6    the charges.

 7        I understand the presumption in the case.  If you look at

 8    the evidence, and we see the lack of any type of physical

 9    evidence, any type of text messages or calls following these

10    alleged incidents from a cell phone that my client gave to the

11    complaining witness that he could have used to call his parents

12    and say help, this just happened to me, I need help, I need

13    somebody, or, once the complaining witness comes back, any type

14    of a cry for help.

15        In fact, we see just the opposite.  We see a kid excited on

16    this trip and doesn't even want to go back to his family and

17    wants to go back out on the road with my client.  That's what

18    we see in this case.  It sounds like a probable cause argument,

19    Your Honor, but it is not.  What it is is a strong argument

20    this Court can be reasonably assured that if you put my client

21    out on bond that he is not a danger to the community and that

22    he is not a flight risk.

23        Now, what will the plan be?  If you are going to put my

24    client out on bond, I talked to a family member, I talked to my

25    client's daughter, I talked to my client's sister, I talked to

1   my client's wife.  It is a common-law relationship they have.

2       But the plan, from what I can gather, I think the best

3   plan, the one that seems to work is that the Court puts my

4   client at Dismas at the halfway house.  The sister who is a

5   nurse practitioner has agreed to rent an apartment for my

6   client and give him a suitable place to live and get back out

7   on the road.

8       Initially, he will be at Dismas until he has a place of his

9   own to live, and, obviously, Pretrial Services can go out to

10  the location to the apartment and make sure it is a suitable

11  location, and through the modification process I would be

12  asking the Court to consider that.

13      Initially, all I am asking the Court to do is allow

14  Mr. Vavra to go to the halfway house where he can continue

15  working with the condition, and he has GPSs on his trucks that

16  can be reported back to Pretrial Services, or we could put a

17  monitor bracelet on him as well.

18      It seems like when you look at the strength of the case and

19  some of the issues that were present, as well as my client's

20  history, it seems like there are conditions and combinations of

21  conditions that can assure his presence in court.  I think that

22  in this case based on the presentation of evidence by the

23  Government that any presumption has, in fact, been rebutted.

24      I will ask the Court at this stage to allow my client to be

25  released out on bond.

1          THE COURT:  Ms. Valenzuela?  Address both

2    probable cause, and move into detention.

3          MS. VALENZUELA:  Yes, Your Honor.

4      Your Honor, as Defense himself noted, there is problems

5    here based on the complaining witness or the victim's outcry

6    and the interview that agents conducted with the victim, and

7    there is plenty of case law saying the victim's testimony is

8    sufficient along with other circumstantial evidence.

9      Just one example is the Fifth Circuit case of the

10   United States versus Hicks, and I can provide you with that

11   citation if you would like, Your Honor.  It is 473 F.3d 146,

12   Fifth Circuit 2006.  The Court held that the jury could infer

13   from circumstantial evidence such as the grooming process that

14   is evidence here as well where the Defendant in that case

15   groomed the victim and provided the victim with a lot of gifts

16   such as trips to an Independence Bowl, and money, and it was

17   sufficient along with the victim's testimony from which the

18   jury could find the Defendant guilty.

19      It is what you have here.  The Agent testified as to the

20   grooming process and how he would isolate the victim and take

21   him on trips, and the Defendant himself even admitted to going

22   on the trips with the victim and admitted to sleeping on the

23   same bed as the victim in all of the trips.  He admitted to

24   wrestling with the victim and possibly accidentally touching

25   him inappropriately.

1      The Government believes there is sufficient evidence in

2   this case the Defendant, Vavra, took the victim across state

3   lines for the purpose of engaging in sexual activity with him.

4   Then you also have the text messages which corroborate where

5   the victim accuses the Defendant and specific as to what the

6   Defendant did to him.

7      Now, as far as detention is concerned, the Defendant faces

8   a mandatory minimum of ten years up to life.  The Defendant has

9   every reason in this case to flee.  More importantly, the

10  Defendant is definitely a danger to the community in this case.

11     After this five year period where he was abusing this

12  little boy from the age of 9 to 14 years old, every time he

13  took him across state lines, and as soon as the relationship is

14  broken with this one victim, the Defendant is seen placing a

15  flyer outside of a business scouting for more potential

16  victim's with his number, with the same type of flyer that

17  occurred five years ago where he initially met this 14 year-old

18  victim now.

19     Certainly, the Government believes that the Defendant is a

20  danger to the community and a flight risk especially

21  considering he doesn't have a suitable residence right now, and

22  I know they have a plan, and there is no third-party custodian

23  identified.

24     For these reasons, the Government respectfully requests the

25  Defendant be detained.

```
 1              THE COURT:  I will find probable cause.  I am also
 2    going to grant the Government's motion to detain.
 3         I don't believe the presumption has been overcome.  The
 4    evidence of danger has been presented, and the Court finds by
 5    clear and convincing evidence that the Government has met its
 6    burden regarding danger and flight risk as well.
 7         Anything else on this case, Ms. Valenzuela?
 8              MS. VALENZUELA:  No, Your Honor.
 9              THE COURT:  Mr. McMahon?
10              MR. McMAHON:  No, Your Honor.  Thank you.
11              THE COURT:  Thank you.  We'll be in recess.
12
13                             *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                        CERTIFICATION
                         _____
2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.  I

5    further certify that the transcript fees and format comply with

6    those prescribed by the Court and the Judicial Conference of

7    the United States.

8

9    Date:  December 23, 2019

10                                    /s/ Walter A. Chiriboga, Jr.
                                      _____
11                                    Walter A. Chiriboga, Jr.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```