FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

2025 AUG -5  AM 11: 18

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
            DEPUTY

TRAVIS WAYNE VAVRA,           §
   Petitioner,              §
                            §           **EP-24-CV-351-DCG**
v.                            §           **EP-20-CR-65-DCG-1**
                            §
UNITED STATES OF AMERICA,     §
   Respondent.              §

### MEMORANDUM OPINION AND ORDER

Travis Wayne Vavra, Federal Prisoner Number 43797-480, challenges his sentence through a *pro se* motion under 28 U.S.C. § 2255. Mot. to Vacate, ECF No. 226.[1] His opposed motion is denied.

### BACKGROUND AND PROCEDURAL HISTORY

Vavra is a 63-year-old inmate at the Federal Medical Facility in Butner, North Carolina. *See* Federal Bureau of Prisons, Find an Inmate, www.bop.gov/inmateloc/ (search for Reg. 43797-480, last visited July 14, 2025).

Vavra was an interstate truck driver. *United States v. Vavra*, No. 22-50276, 2023 WL 6162781, at *1 (5th Cir. Sept. 21, 2023). In 2015, he posted a flyer at a gas station in Anthony, Texas, offering free season passes to a local waterpark. Presentence Investigation, ECF No. 178 at ¶ 5. When he was contacted by D.S., he provided passes for her two children and offered to take her nine-year-old son, R.S., on vacations to explore the United States. *Id.* On July 16, 2015, he took R.S. on a one-week trip to an amusement park. *Id.* After the first trip, he visited R.S. regularly and assisted D.S. with childcare for R.S. and his younger sibling. *Id.* Throughout the relationship,

---

[1] "ECF No." refers to the Electronic Case Filing number for documents docketed in EP-20-CR-65-DCG-1. Where a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

he purchased clothes, food, an Xbox, a Playstation 4, and a cellular telephone for R.S. *Id.* He also provided R.S. with a bank debit card and a credit card, both in Vavra's name, for R.S. to purchase items. *Id.* When he traveled with R.S., he arranged to stay with him in the same hotel rooms and at his son's house. *Vavra*, No. 22-50276, 2023 WL 6162781, at *1. When he was accused of sexually abusing R.S. in 2019, he instructed R.S. to delete information from his phone. *Id.* When he was arrested, he had pictures and videos depicting child sexual abuse in a subfolder on his phone. *Id.*

Vavra was charged in a two-count superseding indictment with transporting minors with the intent to engage in criminal sexual activity (Count One) and possessing visual depictions involving the sexual exploitation of a minor (prepubescent/under 12 years of age) (Count Two). Superseding Indictment, ECF No. 41.

At trial, R.S.'s father testified that when R.S. was approximately 14 years old, he disclosed that Vavra had sexually abused him. Trial Tr., vol. 4 at 23–53, ECF No. 198. R.S.'s mother testified that she allowed R.S. to go on several interstate trips with Vavra and added that Vavra helped her family financially by buying things for R.S., including a cellphone, clothes, games, and supplies for sports and school. *Id.* at 80–166.

R.S. testified that Vavra first abused him on a trip in the fall of 2015 and continued to sexually molest him on subsequent trips. *Vavra*, 2023 WL 6162781, at *1. He claimed that Vavra abused him in their shared hotel rooms and at his son's house. *Id.* R.S. explained that the abuse included oral sex and anal penetration. *Id.* R.S. reported that Vavra also showed him pornographic videos on his phone involving children who appeared to be between the ages of three and fourteen. *Id.*

2

A Sexual Assault Nurse Examiner (SANE), Dr. Vanessa Velez, testified that she performed a forensic sexual assault examination of R.S. after his initial outcry and determined that he had sustained injuries consistent with "trauma related to penetration." *Id.*

Vavra's step-grandsons, Aaron and Nathan, testified that Vavra had molested them. *Id.* They also claimed that they had observed pictures of nude children while using Vavra's cellphone as well. *Id.*

Aaron explained that he took a trip in Vavra's truck when he was twelve or thirteen years old. *Id.* Aaron testified that Vavra groped his genitals during the trip. *Id.* Aaron added that sometime around 2018, he saw a couple of pictures on Vavra's phone of nude six-to-twelve-year-old boys and a toddler urinating. *Id.* Aaron explained that the phone's search history included an entry for "boys in bathing suits." *Id.*

Nathan testified that when he was about thirteen years old, Vavra started coming into his bedroom and touching his genitals. *Id.* Nathan additionally claimed that he observed pictures on Vavra's phone of nude five-to-six-year-old boys and boys modeling underwear, but he added that the pictures were "not sexual-like." *Id.*

After the Government rested, Vavra called several character witnesses. Nathan Lee Sauceda, a friend of Aaron's, testified that he took several trips with Aaron and Vavra when he was a minor from the time that he was around fifth or sixth grade until he was approximately 17 years old. Trial Tr., vol. 7, ECF No. 201 at 10–16. Sauceda maintained that Vavra never made him feel uncomfortable; he did not witness Vavra sexually abuse anyone; and Vavra never sexually abused him. *Id.* Vavra's stepdaughter, sister, and brother-in-law each testified as to Vavra's good character; claimed they observed Vavra and R.S. together; reported they did not witness anything

3

concerning or inappropriate about their relationship; and maintained they trusted Vavra with children. *Id.* at 10–16; 20–25; 55–61; 69–75. Vavra's stepdaughter, sister, and brother-in-law each testified that Vavra was not good with technology; Vavra's grandsons used his Samsung cellphone on several occasions; and Vavra's grandsons played pranks on Vavra by downloading content onto his phone and sending messages from his phone. *Id.*

Vavra testified on his own behalf. *Vavra*, 2023 WL 6162781, at *1. He denied sexually abusing R.S. or touching Aaron or Nathan. *Id.* He claimed that he never downloaded or viewed child pornography. *Id.*

Vavra was convicted by a jury on both counts of the indictment and was sentenced to life in prison. *Id.*

On appeal, Vavra argued (1) the Court erred in denying his motion to sever the two counts; (2) the Court abused its discretion in allowing Aaron and Nathan to testify about the material they observed on his cellphone; and (3) the record was devoid of evidence that he knowingly possessed the child pornography found on his cellphone. *Id.* at *2. His arguments were rejected, and his conviction and sentence were affirmed by the Fifth Circuit Court of Appeals. *Id.* at *3.

In his § 2255 motion, Vavra brings three ineffective-assistance-of-counsel claims against Assistant Federal Public Defenders Shane McMahon and Elyse Bataller-Schneider. First, he asserts his counsel erred by failing to call exculpatory witnesses to show his actual innocence. Mot. to Vacate, ECF No. 226 at 4. Second, he contends his counsel erred when they failed to use his actual innocence as a defense. *Id.* at 5. Third, he avers his counsel erred when they failed to litigate the "true facts" of his case. *Id.* at 7. Additionally, he argues that he did not receive a fair trial in El Paso because of the media attention surrounding his case. *Id.* at 14, 15, 20. Finally, he claims that

one of the jurors attended R.S.'s church. *Id.* at 13, 14. In his supporting documentation, he contends "[e]veryone falsely accused me and told lies at my trial." *Id.* at 27. He provides various statements in support of his claim of actual innocence in an apparent attempt to relitigate his case. *Id.* at 13–35. He asks the Court for "a new public defender to help [him] with this 2255 retrial." *Id.* at 14. He also asks the Court for "any ... relief to which [he] may be entitled." *Id.* at 12.

## STANDARD OF REVIEW

Section 2255 "'provides the primary means of collateral attack on a federal sentence.'" *Pack v. Yusuff*, 218 F.3d 448, 451 (5th Cir. 2000) (quoting *Cox v. Warden*, 911 F.2d 1111, 1113 (5th Cir. 1990)). But "it does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). It is not a "substitute for direct appeals." *United States v. Willis*, 273 F.3d 592, 596 (5th Cir. 2001); *see also United States v. Frady*, 456 U.S. 152, 167 (1982) (imposing a "cause and actual prejudice" standard on motions for collateral relief when no objection was made on direct appeal); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating "[w]here the petitioner—whether a state or federal prisoner—failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice.'"). It identifies only four grounds on which a prisoner may obtain relief: (1) the "sentence was imposed in violation of the Constitution or laws of the United States, (2) the sentencing court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) the sentence is otherwise subject to collateral attack." *United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995) (citations omitted). Consequently, § 2255 does not permit relief on a claim of error that is neither constitutional nor jurisdictional unless the error constitutes "a fundamental defect which inherently results in a

5

complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962). It also requires the prisoner to bear the burden of establishing a claim of error by a preponderance of the evidence. *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980) (citing *United States v. Kastenbaum*, 613 F.2d 86, 89 (5th Cir. 1980)). It permits a court to "vacate and set the judgment aside" if a prisoner's claims are meritorious and to "discharge the prisoner or resentence him or grant [him] a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). But it also allows a court to dismiss the motion "[i]f it plainly appears from the motion ... and the record of prior proceedings that the moving party is not entitled to relief." 28 U.S.C. foll. § 2255 Rule 4(b); *see also* 28 U.S.C. § 2255(b); *United States v. Drummond*, 910 F.2d 284, 285 (5th Cir. 1990) ("Faced squarely with the question, we now confirm that § 2255 requires only conclusive evidence—and not necessarily direct evidence—that a defendant is entitled to no relief under § 2255 before the district court can deny the motion without a hearing.").

Despite these limitations, a prisoner may still bring a Sixth Amendment "ineffective-assistance-of-counsel claim ... in a collateral proceeding under § 2255." *Massaro v. United States*, 538 U.S. 500, 504 (2003). If he does, his claim is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Willis*, 273 F.3d 592, 598 (5th Cir. 2001). To prevail, he has the burden of showing (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 689–94. To establish deficient performance, he must prove that his counsel's assistance fell "'below an objective standard of reasonableness.'" *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003) (quoting *Strickland*, 466 U.S. at 688). In other words, he must show his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

6

Amendment." *United States v. Lincks*, 82 F.4th 325, 330–31 (5th Cir. 2023). "[T]o establish prejudice, [he] 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (quoting *Strickland*, 466 U.S. at 694).

## ANALYSIS

### A. Failure to Call Witnesses

Vavra first contends that his counsel erred by failing to call exculpatory witnesses to establish his actual innocence. Mot. to Vacate, ECF No. 226 at 4.

Strategic choices by counsel "are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Indeed, "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (quoting *Strickland*, 466 U.S. at 689–90). To rebut this presumption, a prisoner must prove "that his attorney's representation was unreasonable under prevailing professional norms and the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).

"[D]eciding whether to call witnesses is a strategic trial decision." *United States v. Harris*, 408 F.3d 186, 190 (5th Cir. 2005). As a result, "complaints of uncalled witnesses are 'disfavored' as a source of *Strickland* habeas review." *Id.* Additionally, "allegations of what a witness would have testified are largely speculative." *United States v. Fields*, 761 F.3d 443, 461 (5th Cir. 2014) (internal citation and quotations omitted); *see also Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) ("speculation about what witnesses would have said on the stand is too uncertain"). And

7

when defense counsel calls witnesses to portray defendants as individuals with good character, the

prosecution can cross-examine those witnesses and introduce evidence to rebut their claims. *Pape*

*v. Thaler*, 645 F.3d 281, 289 (5th Cir. 2011). Consequently, a movant has a difficult burden:

> [T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the [movant] must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.

*Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

Vavra claims that his grandson Aaron's friend, Alfred Ramos, and Alfred's aunt, Liz

Ramos, would have testified for him at trial—but he could not locate them because he was denied

bond and remained in pretrial detention. Mot. to Vacate, ECF No. 226 at 25, 28. He asserts that he

has known Alfred since he was nine years old and adds that he took Alfred to football practice. *Id.*

at 28. He maintains that Alfred would have testified he never abused him. *Id.* As to Liz Ramos,

Vavra does not explicitly set out the content of her anticipated testimony but claims that she has

known him for several years. *Id.* Notably, Vavra provides no support for a claim that either Alfred

or Liz Ramos was available and would have testified for him. For several other potential witnesses,

Vavra does nothing more than list their names. *See id.* at 25.

Significantly, Vavra's stepdaughter, sister, and brother-in-law did testify that they believed

Vavra had good moral character; trusted Vavra around kids; and never witnessed Vavra engage in

inappropriate behavior with children. Trial Tr., vol. 7, ECF No. 201 at 20–25; 55–61; 69–75. A

fourth character witness, Nathan Sauceda, testified that he had known Vavra since he was a kid;

had gone on interstate trips with Vavra; and never felt uncomfortable or believed he was sexually

abused. *Id.* at 10–16. The testimony of additional character witnesses would have been cumulative.

Vavra fails to meet this burden of proving that his counsel provided ineffective assistance based on their failure to call any of the other witnesses he lists or alludes to in his motion. He does not demonstrate that any of these uncalled witnesses were available to testify at the time of trial, that they would have done so, or discuss the content of their proposed testimony. Hence, he has not demonstrated that their testimony would have been favorable to his defense.

Further, Vavra has not shown that his defense counsels' failure to call these witnesses was not within the realm of sound trial strategy. *See Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984) ("[The movant] must overcome the strong presumption that [his attorney's] decision in not calling [the witness] was a strategic one.").

Finally, Vavra has not demonstrated actual prejudice from his defense counsels' failure to call these witnesses. He has *not* shown that but for their failure to call these witnesses, the result of the trial would have been different, and he would have been found not guilty. *See Murray v. Maggio*, 736 F.2d at 282 ("[W]hen a defendant has challenged his conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."). In Vera's trial record, "there was considerable and ample evidence ... demonstrating that Vavra was sexually interested in children, that he transported R.S. in order to sexually abuse him, and that he possessed the child pornography on his black Samsung Galaxy phone." *Vavra*, 2023 WL 6162781, at *3. Additional character witnesses would not have been enough to undermine confidence in the jury's guilty verdict.

### B. Failure to Use Actual Innocence as a Defense

Vavra contends his counsel erred when they failed to use his actual innocence as a defense. Mot. to Vacate, ECF No. 226 at 5.

The record does not support Vavra's claim. On the contrary, it demonstrates that showing Vavara was actually innocent was his defense counsels' main strategy and the theme of his defense. For example, during opening statement, his lead defense attorney asserted:

> Ladies and gentlemen, when you received your summons to come in as jurors, Mr. Vavra was an innocent man. And the Judge explained to you how the presumption of innocence works.
>
> When you came in and we had our voir dire questions, Mr. Vavra was an innocent man. When you took your oath as jurors, Mr. Vavra was an innocent man and throughout the course of the government's testimony, Mr. Vavra as an innocent man, and Mr. Vavra is an innocent man here today.

Trial Tr., vol. 7, ECF No. 201 at 7.

Additionally, Vavra took the stand, denied all the criminal allegations made against him, and asserted he was not guilty:

> [Defense Counsel MR. McMAHON]. And you are charged in Count One with the transportation of minors with the intent to engage in criminal sexual activity; do you understand that?
>
> [MR. VAVRA]. Yes, sir.
>
> Q. Are you guilty of that offense?
>
> A. No, sir.
>
> Q. You are charged in Count Two of possession of a visual depiction involving the sexual exploitation of a minor. Are you aware of that?
>
> A. No.
>
> Q. Are you guilty of that offense?
>
> A. No, sir.

Id. at 82–83. When Vavra's lead defense attorney asked him about the CSAM images entered as exhibits during the trial, he stated:

10

[MR. McMAHON]. So, you know that the F.B.I. has pulled some videos and some images of [sic] that phone?

[MR. VAVRA]. Right.

Q. Okay. Before your arrest, did you know that stuff was on your phone?

A. No. …

….

Q. But the images we saw in court?

A. That filth? No. I've never seen that on my phone.

Q. Okay. When we were sitting here, you were sitting here when those images came up. Do you remember that?

A. Right. Right.

Q. What did you think when these images came up?

A. That's disgusting and I don't believe that was on my phone. I really don't.

*Id.* at 106. When asked about the allegations of sexual abuse that Aaron, Nathan, and R.S. made against him during trial, Vavra denied those accusations:

[MR. McMAHON]. As you know, Aaron came into Court and told the jury that while he was on the truck one time, that you touched him inappropriately.

[MR. VAVRA]. That never happened.

Q. Right, but you know that the testimony – you know the testimony, you heard the testimony, right?

A. Yeah. Yes, sir.

Q. Okay. And he testified that it happened while he was alone on that truck with you?

A. Yeah. That didn't happen.

11

Q. Okay. So you're denying that that happened?

A. I am denying that happened.

Q. Okay. You know Nathan came in and testified that at the house that you would go into the bedroom at night and touch him inappropriately?

A. That never happened neither . . .

Q. So, you're denying that ever happened with Nathan?

A. Yes. I'm denying on both of them. I never touched no kid like that.

Q. And you heard R.S. come into court and heard R.S. testify that there were many terrible things that happened to him while he was on the truck with you?

A. Didn't happen. Didn't happen.

Q. Okay.

. . . .

Q. Okay. So, specifically, you know, R.S. said that, you know, you – you touched his – touched his genitals and that you put your mouth on his genitals and that he put – he was forced to put his mouth on your genitals?

A. No, that never happened. Never happened.

Q. So you're denying that any –

A. I'm denying all of that suff.

*Id.* at 107-108. When his lead defense attorney then asked, "Mr. Vavra, are you guilty of those terrible charges?" Vavra responded: "No, I am not." *Id.* at 108.

Vavra's lead counsel argued in closing that Vavra was innocent and attempted to rebut or explain the evidence the Government had presented. *Id.* at 193–205. Specifically, he asserted the end of his closing argument:

Members of the jury, Travis Vavra, the guy who's terrible at technology, he didn't download those images. That phone was passed around by so many people, you

12

can't say that he knew it was on there. He didn't molest that kid. He loved that kid.
He cared for that kid.

*Id.* at 205.

Consequently, the record does not support Vavra's claim that his attorneys were ineffective because they did not use actual innocence as a defense. It supports the opposite conclusion. And the trial record contained "considerable and ample evidence … demonstrating that Vavra was sexually interested in children, that he transported R.S. in order to sexually abuse him, and that he possessed the child pornography on his black Samsung Galaxy phone." *Vavra*, 2023 WL 6162781, at *3.

### C. Failure to Litigate "True Facts"

Finally, Vavra avers his counsel provided ineffective assistance when they failed to litigate the "true facts" of his case. Mot. to Vacate, ECF No. 226 at 7. His support for this claim consists of little more than expressions of his displeasure with the outcome of his case and his incoherent ramblings about facts he asserts—without support—are true. *See United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Because [the movant] has offered little more than his displeasure with the outcome of the trial and sentencing hearing to support his arguments" his request for a COA failed.). Additionally, his counsel did address several of his claims during his trial.

### (1) Vavra Claims His Counsel Failed to Litigate that Aaron, R.S., And Nathan All Lied About the Sexual Abuse

For example, Vavra repeatedly asserted throughout his motion that Aaron, R.S., and Nathan all lied about the sexual abuse, and he claimed that Aaron told R.S. and Nathan to lie about the sexual encounters. Mot. to Vacate, ECF No. 226 at 13–33.

13

But Vavra's counsel called Vavra's sister, Arlene Kay Crist, who testified that Aaron had lied about Vavra abusing him.

[MR. McMAHON]. And have you had the opportunity to get to know Aaron?

[MS. CRIST]. I've known him all his life.

Q. Okay. Was there a time when you had a conversation with Aaron at a Texas Road House?

A. Yes.

Q. Tell me about that conversation. What happened during that conversation?

A. I -- it was shortly after Travis [Vavra] was arrested and I came down to get his final paycheck ... and we met at the Texas Road House. And while we were standing out in the parking lot, we were discussing the -- what was going on with Travis [Vavra], and Aaron said that he had told the people that he lied. That he was -- that Travis [Vavra] had touched him, but that he lied.

Q. And after Aaron told you he lied about Mr. Vavra touching him, did you have any response to that?

A. My response was is [sic] I could never imagine Travis doing anything of that nature.

Q. I -- thank you. Did you have response to Aaron? Did you say anything to him?

A. That was my response was I couldn't imagine Travis doing -- ever doing anything of that nature.

Q. And did Aaron reply to that?

A. He just shook his head.

Q. And what was his demeanor, as you saw it?

A. Same as always. I mean he wasn't anything different. He was acting calm and ...

14

Trial Tr., vol. 7, ECF No. 201 at 58–59. And during his closing argument, Vavra's counsel argued

that R.S. lied about the abuse.

> The next item that [the prosecutor] showed you was the text message from R.S. saying you abused me and you would always come with threats. Well, there was no evidence of these threats, right? And that's the problem, because R.S. forgot to include that when he started making up his stories. And R.S., I don't -- I don't [believe] him. Actually, I feel bad for him, actually, because he started something -- something got started that snowballed out of control, and when that happens it is very difficult for a 14-year-old boy to take it back. It is very difficult when your parents bring you to the sheriff's office. It's very difficult when the F.B.I. shows up. It's very difficult when you start having to go to all of these different appointments with the F.B.I., when you have medical appointments. When things get out of control it's difficult to take it all back. And I understand that, but that's the position that R.S. was in.

*Id.* at 194. He further argued that Aaron did not like Vavra.

> Aaron ... definitely does not like Travis Vavra. He wants you to believe that Mr. Vavra molested him, but we know that before R.S. made any accusations at all, R.S. was friends with Aaron. They talked. Aaron actually brought up this subject with him. So we know all of that happened, but most importantly, we know that R.S. knew about the text messages that Aaron had sent to Mr. Vavra. We know that that happened before he said anything. So, R.S., either in conjunction with or in cahoots with Aaron, makes a similar accusation.

*Id.* at 196–97. In elaborating on Aaron and Nathan's conspiracy to fabricate their stories, Vavra's

counsel stated:

> Now, Aaron can't keep his stories straight and it's a problem, right, because he gets with his brother [Nathan] and says, hey, we got to make the same accusation. We got to do it. Okay? When did this happen? It happened in the bed ... Nathan said my brother told me it happened in the bed, so I'm saying it happened in the bed, but they didn't get their stories straight because Aaron said it happened to him on the truck. And we know Aaron makes up stories.

*Id.* at 197. Vavra's counsel concluded, "Aaron has already manipulated Nathan into making up a

story and Aaron has had contact with R.S. prior to R.S. making similar accusations. That's what

the evidence shows in this case." *Id.* at 198.

Consequently, Vavra's counsel did argue that Aaron, Nathan, and R.S. all lied about the sexual abuse and any ineffective assistance claim on that basis is unfounded. So, Vavra cannot show that his counsels' performance was either deficient or prejudiced his cause.

### (2) Vavra Claims His Counsel Failed to Litigate that Consitpation Caused R.S.'s Anal Fissure

Vavra repeatedly mentions the fact that R.S. was constipated, argues that this is what caused R.S.'s anal fissure, and claims that the forensic Sexual Assault Nurse Examiner (SANE), Dr. Vanessa Velez, destroyed pictures of R.S.'s exam because her testimony that R.S. had an anal fissure was a lie. Mot. to Vacate, ECF No. 226 at 17, 23, 29, 32–33.

But Vavra's counsel did litigate these points during his trial. He objected to the missing photographs of the anal fissure.

> MR. McMAHON: Your Honor, the last witness testified that he was submitted himself to medical exams. I understand that those are the exams that [Dr. Velez] intends to testify to as an expert. The problem is that [R.S.] testified that there were photographs taken and we've not received any of those photographs.
>
> [PROSECUTOR] MS. VALENZUELA: We don't have those photographs either.
>
> THE COURT: Did you know about them?
>
> MS. VALENZUELA: We did not no. I think we had asked Dr. Velez about the photographs and she said she could not recall and that she would check and she never ...
>     ....
> MR. McMAHON: I object to allowing the government to call this witness when there are -- when the expert -- if the expert took photographs, that we are not being -- that are not being made available to the defense.
>
> THE COURT: All right. That objection it overruled.

Trial Tr., vol. 5, ECF No. 199 at 166–68.

Vavra's counsel cross examined Dr. Velez about the photos she took during her examination of R.S. and about her decision to delete them.

[MR. McMAHON]. After you saw them you chose to delete them?

[DR. VELEZ]. Yes.

Q. Okay. And by choosing to delete them, we'll never see them, right?

A. Correct.

Q. Okay. So we are left to trust that what you say you saw is what you actually saw, right?

A. Based on my medical experience.

Q. Right. But we could have had -- we could've had visual evidence of what you saw, too. That could've been possible?

A. They were not visible. You would not be able to see anything on the picture.

Q. And you made that call?

A. Correct.

*Id.* at 200–201. Vavra's counsel additionally questioned Dr. Velez on the possibility of constipation causing anal fissures.

[MR. McMAHON]. So let's say that I was, me, and you don't you you don't know me, but you do know that I'm driving down the road stopping at Wendy's, stopping at Hardee's, stopping at McDonald's ... and I came to you and I said, hey, dad, I'm eating nothing by McDonald's and, guess what, I am constipated, you would not be surprised?

[DR. VELEZ]. No.

Q. And constipation is certainly a cause of anal fissures; isn't that right?

A. Chronic constipation.

Q. Yeah. Okay. Chronic constipation, which, again, depending on the person could be as little as two or three bowel movements?

A. No.

....

A. I cannot give you a specific answer, because there would be more that would entail for the diagnosis of chronic constipation. It would not just be having - - not having a bowel movement for two or three days. There's more of a medical work-up that you would need to be able do for the diagnosis of chronic constipation.

Q. So the answer is, you don't know how long it would take for someone eating a terrible diet to develop an anal fissure as a result of that?

A. No.

*Id.* at 210–212. Finally, he argued during his closing argument that R.S.'s anal fissure was caused

by constipation.

> The government brings up Nurse Velez. And Nurse Velez's testimony is very important, because what did we learn from Nurse Velez? Supposedly R.S. has an anal fissure. What's an anal fissure? It's a tear or a break that causes, in the chronic version, which is what she testified to, that causes some scarring. Two types of anal fissures; acute, which happened recently, and chronic, which happened sometime in the past. And there's no way to know when it happened. It could've happened as an infant, all the way through the time that he was examined, if there was any anal fissures [sic] at all, because this supposed expert is not an expert.

> She works for the government. The F.B.I. goes to her and says, we have sex abuse you have to exam him until you find evidence, that's why she testified she's not getting paid. She testifies on duty, because she's an arm of the government. In 1,000 cases of child sex abuse, zero in her view have been false outcries. Now how is that possible statistically, unless your job is to always find something, always without fail, and that's what they did. She did her job in this case. So she claims she only found one. Where was it? It was on the outside, right, not consistent with penetration, because then it would be in the anal canal. It was outside. And what are the causes of anal fissures? Well, it's very common for babies. Anybody knows that babies get constipated. It could happen then.

Trial Tr., vol. 7, ECF No. 201 at 198–199.

18

Consequently, the record does not support Vavra's claim that his counsels' performance was either deficient or prejudiced his cause. It shows his counsel did argue that R.S.'s constipation caused his anal fissure.

### (3) Vavra Claims His Counsel Failed to Litigate that Aaron and/or R.S. Planted the CSAM Photos on His Phone

Vavra argues several times throughout his motion that he did not know the CSAM photos were on his phone; claims that R.S. and Nathan knew what was on that phone better than he did; asserts that R.S. was good with technology and knew how to hack into his phone; and claims that Aaron and R.S. placed the CSAM photos on his phone. *See, e.g.*, Mot. to Vacate, ECF No. 226 at 13, 15–20, 23, 27, 29.

But Vavra's counsel called Vera's stepdaughter, Kassi Rae McDaniel, who testified that her nephews, Aaron and Nathan used Vavra's phone which contained the CSAM.

[MR. McMAHON]. Did you ever see Mr. Vavra with a cell phone, a black cell phone?

[MS. MCDANIEL]. Yes.

Q. Do you ever see Mr. Vavra using that telephone?

A. Yes.

Q. Do you ever see anybody else using that telephone?

A. Yes.

Q. Who else?

A. My niece and my nephews.

Q. Your niece and nephews. What are their names?

A. Briana, Aaron and Nathan McDaniel.

Q. And when they were using the cell phone, in what capacity were they using it?

A. At those times they used it for their phone and then they'd get a new phone and that phone would just be put away for use later on.

Q. All right. So you're saying your niece and both of your nephews would use it as their primary phone?

A. Yes.

Trial Tr., vol. 7, ECF No. 201 at 22–24. McDaniel further testified that Aaron used Vavra's phone to call, text, browse the internet, and to play pranks on Vavra by sending funny messages and images to Vavra's coworker and boss. *Id*. at 24.

Vavra's sister, Arlene Kay Crist, testified that Vavra was "technologically challenged" and that "anything he needed looked up, he would always have R.S. do it if he was present or … sometimes Aaron [or] Nathan." *Id*. at 60. She further testified that she observed Aaron and Nathan use Vavra's phone without his permission on various occasions to send text messages as pranks. *Id.*

Vavra's brother-in-law, Ronald C. Crist, also testified that Vavra was not very good with technology and that "short of making phone calls and [an] occasional text," Vavra could not use his phone to do other things, such as "surf the net." *Id.* at 73. He further testified that he saw Aaron, Nathan, and R.S. all use Vavra's phone, that they all helped Vavra with his phone, and that they all played pranks on Vavra by placing photos on his phone. *Id.* at 73–74.

Finally, during closing argument, Vavra's counsel argued that Vavra, who was "terrible at technology," did not download the CSAM images on his cellphone and emphasized that Vavra's

cellphone was "passed around by so many people, you can't say that he knew that it was on there." *Id.* at 205.

Once again, the record does not support Vavra's claim that his counsels' performance was either deficient or prejudiced his cause when they did, in fact, attempt to litigate that Aaron and/or R.S. planted the CSAM photos on his phone. Vavra is not entitled to relief on this claim.

### (4) Vavra's Assertions that His Counsel Failed to Litigate "True Facts" Are Not Supported by the Record

Vavra asserts other claims that his counsel did not litigate the true facts. But his claims are not supported by the record. His "bald assertions on … critical issue[s] in his *pro se* petition … unsupported and unsupportable by anything else contained in the record, [have no] probative evidentiary value." *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983). His claims that his counsel was ineffective because he failed to litigate these true facts—without even suggesting how his counsel should have litigated these facts—does not overcome "the strong presumption that counsel performed adequately and exercised reasonable professional judgment." *Strickland*, 466 U.S. at 688.

### D. Other Claims

### (1) Venue

Vavra to argue that his counsel should have moved to change venue because "the news and internet had me convicted before [he] went to trial. Mot. to Vacate, ECF No. 226 at 15. But he fails to offer any support for his claim that there was significant, prejudicial media attention surrounding his case.

Significantly, Fifth Circuit precedent provides that "a change of venue should not be granted on the mere showing of widespread publicity." *United States v. Whitmore*, 386 F. App'x

464, 469 (5th Cir. 2010) (internal citation and quotations omitted). Consequently, it would have been difficult for Vavra's counsel to demonstrate that "the limited media coverage ... was in excess of the sensationalism inherent in the crime or that pervasive community prejudice resulted from the publicity." *See id.* Hence, Vavra's counsel was not deficient in failing to move to change venue. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

### (2) Juror

Vavra also claims that one of his jurors attended R.S.'s church. Mot. to Vacate, ECF No. 226 at 13, 14. But he fails to corroborate his assertion and does not allege that this juror even knew R.S. And during voir dire, none of the jurors responded in the affirmative when the Government showed them R.S.'s photo and the Court asked them whether anyone knew R.S. Trial Tr., vol. 3, ECF NO. 197 at 15.

Moreover, Vavra fails to establish that his counsel would have been successful in demonstrating that this unnamed juror was biased and, therefore, Vavra has also failed to establish that his attorneys would have been able to keep this juror off the jury. Vavra's haphazard statements regarding this unnamed juror "lack sufficient specificity under even the most liberal pleading requirements." *Saunders v. United States*, 236 F.3d 950, 953 (8th Cir. 2001).

### CERTIFICATE OF APPEALABILITY

A movant may not appeal a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(B). He may not

receive a certificate of appealability unless he "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). He "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" when district court rejects his constitutional claims on the merits. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* to a certificate of appealability determination in the context of § 2255 proceedings). He must show both that "jurists of reason would find it debatable whether the motion states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling" when district court rejects his claims solely on procedural grounds. *Slack*, 529 U.S. at 484.

Reasonable jurists could not debate the Court's reasoning for denying Vavra's claims on substantive or procedural grounds—or find that his issues deserve encouragement to proceed. *Miller El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484).

The Court will not issue a certificate of appealability.

## CONCLUSIONS AND ORDERS

The Court concludes that Vavra has failed to meet his burden of showing his counsel's (1) performance was deficient and (2) the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 689–94. The Court further concludes that Vavra has failed to successfully assert claims establishing (1) his "sentence was imposed in violation of the Constitution or laws of the United States, (2) the sentencing court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) the sentence is otherwise subject to

23

collateral attack." *Seyfert*, 67 F.3d at 546. The Court also concludes that Vavra is not entitled to a certificate of appealability. Accordingly, the Court enters the following orders:

**IT IS ORDERED** that Travis Wayne Vavra's *pro se* "Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" (ECF No. 226) is **DENIED**, and his civil cause is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Travis Wayne Vavra is **DENIED** a **CERTIFICATE OF APPEALABILITY**.

**IT IS FURTHER ORDERED** that all pending motions, if any, are **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the District Clerk shall **CLOSE** this case.

**IT IS SO ORDERED.**

**SIGNED** this _____ 4th _____ day of August 2025.

DAVID C. GUADERRAMA
**SENIOR UNITED STATES DISTRICT JUDGE**